UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


-------------------------------------x

        In the Matter
          of
                            Case Nos.
  H.C. ENTERTAINMENT CORP.,     01-B-13591
               Debtor,     01-B-13592
     -and-

  LANSDOWN ENTERTAINMENT CORP.,
               Debtor.

-------------------------------------x


               July 10, 2001

               United States Custom House
               One Bowling Green
               New York, New York 10004


Adj. From: 07/09/01 (1) Hearing Regarding Terms of
sale of assets; Adj. from: 07/09/01 (1); Hering
Regarding terms of Sale of Assets.


B E F O R E:

        HON. ROBERT E. GERBER

               Bankruptcy Judge.

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2

 3        A P P E A R A N C E S :

 4

 5             BACKENROTH, FRANKEL & KRINSKY, LLP

 6                     Attorneys for Debtor

 7                     One Dag Hammarskjold Plaza

 8                     885 Second Avenue

 9                     New York, New York 10017

10

11        BY:    MARK A. FRANKEL, ESQ., of Counsel

12                        -and-

13        BY:    ABRAHAM BACKENROTH, ESQ., of Counsel

14

15

16

17             VICTOR & BERNSTEIN, P.C.

18                     Attorneys for Flatiron

19                     18 East 41st Street

20                     New York, New York 10017

21

22        BY:    SAUL L. VICTOR, ESQ., of Counsel

23

24

25
```

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2

 3        A P P E A R A N C E S (Continued) :

 4

 5                SCHWARTZ, LICHTENBERG, LLP

 6                        Attorneys for Mansion Realty

 7                        The Bar Building

 8                        36 West 44th Street, Suite 1111

 9                        New York, New York 10036

10

11                BY:    BARRY E. LICHTENBERG, ESQ.,

12                                            of Counsel

13

14

15

16                LeBOEUF, LAMB, GREENE & MacRAE, ESQS.

17                        Attorneys for Waterfront NY, LP

18                        125 West 55th Street

19                        New York, New York 10019

20

21                BY:    JOHN P. CAMPO, ESQ., of Counsel

22                            -and-

23                BY:    JAY SAFER, ESQ., of Counsel

24

25
```

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2

 3        A P P E A R A N C E S (Continued) :

 4

 5

 6

 7              STEVEN I. HONIG, ESQ.

 8                      General Counsel to Waterfront NY

 9                      Realty Corp.

10                      224 12th Avenue

11                      New York, New York 10001

12

13

14

15              DAVID J. KENNEDY, ESQ.

16              U.S. Department of Justice

17              U.S. Attorney's Office

18              Southern District of New York

19                      Attorney for Internal Revenue

20                      Service

21                      100 Church Street, 19th Floor

22                      New York, New York 10007

23

24

25
```

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2

 3        A P P E A R A N C E S (Continued):

 4

 5

 6             NEAL S. MANN, ESQ.

 7             Assistant Attorney General

 8             Office of the Attorney General

 9                  Attorney for New York State Liquor

10                  Authority

11                  120 Broadway

12                  New York, New York 10271-0221

13

14

15

16             CAROLYN S. SCHWARTZ, ESQ.

17             Office of the United States Trustee

18                  33 Whitehall Street

19                  New York, New York 10004

20

21             BY:   TRACY HOPE DAVIS, ESQ., of Counsel

22                        -and-

23             BY:   GREG ZIPES, ESQ., of Counsel

24

25
```

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2                      P R O C E E D I N G S

3                      THE COURT:  Okay, we have two

4      non-jointly administered but related cases,

5      H.C. Entertainment and Lansdown Entertainment,

6      which I confess to have referred to

7      colloquially as The Tunnel and Limelight.

8                      Let me get appearances from

9      everybody.

10                     MR. BACKENROTH:  Yes, Abraham

11     Backenroth for the Debtor, for both Debtors.

12     Backenroth, Frankel & Krinsky.

13                     THE COURT:  Okay.

14                     MR. LICHTENBERG:  Barry

15     Lichtenberg of Schwartz, Lichtenberg for the

16     landlord on the landlord bankruptcy.

17                     THE COURT:  Lansdown landlord.

18                     MR. VICTOR:  Saul Victor of

19     Victor & Berstein, P.C. for the <STOERPB>

20     Flatiron, the prospective purchaser in

21     connection with the Lansdown matter, which is

22     also known as the Limelight.

23                     THE COURT:  Okay.

24                     MR. FRANKEL:  Mark Frankel,

25     Backenroth, Frankel & Krinsky for the Debtor.

```
 1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2                    THE COURT:  Okay, Mr. Frankel.

 3                    MR. CAMPO:  John Campo, LeBoeuf,

 4       Lamb, Greene & MacRae for the Waterfront, the

 5       landlord of The Tunnel.

 6                    MR. HONIG:  Steve Honig, general

 7       counsel for Waterfront New York.

 8                    THE COURT:  Your last name again?

 9                    MR. HONIG:  Honig, H-o-n-i-g.

10                    THE COURT:  Okay, Mr. Honig.

11                    MR. SAFER:  Jay Safer, LeBoeuf.

12                    THE COURT:  You are with Mr.

13       Campo.

14                    MS. DAVIS:  Tracy Davis.

15                    THE COURT:  Okay, Ms. Davis.

16                    MR. MANN:  Neal Mann, New York

17       State Attorney General's Office on behalf of

18       the State Liquor Authority.

19                    THE COURT:  Okay.

20                    MR. KENNEDY:  And, finally --

21                    THE COURT:  I am sorry, Mr. Mann.

22       I know the SLA is interested in this matter,

23       but if the SLA is actually objecting on

24       anything, I am not aware of that.

25                    MR. MANN:  The SLA today is an
```

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    interested objector.

3                    MR. KENNEDY:  David Kennedy, U.S.

4    Attorney's Office for the IRS.

5                    THE COURT:  Okay, Mr. Kennedy.

6                    All right, we have your sale

7    motion, Mr. Backenroth.  And, we also have Mr.

8    Campo's desire to get his rent amending that.

9                    To what extent, if any, have any

10   objections that were raised by the IRS, Mr.

11   Campo, or otherwise, been consensually

12   resolved?

13                    MR. BACKENROTH:  Well, Your

14   Honor, we have gone through the objections of

15   the U.S. Trustee's office.

16                    I think we have dealt with the --

17   we have not had an opportunity to go over all

18   of this with Ms. Davis, but we have attempted

19   to deal with all of those objections.  And, I

20   can go through all of those things.

21                    There is a disclosure concerning

22   the purchaser.  Neither of the purchasers have

23   anything to do with Mr. Gatin or Mrs. Gatin.

24                    I think the other issue was the

25   issue concerning the sale.

H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

1

2          I think that we do lay out the

3   basis for a sale, an immediate sale, even

4   outside of a plan.  The fact of the matter is,

5   is that this Debtor is difficult, has

6   difficulties operating.  It has the threat of a

7   termination of it's liquor license by the SLA

8   hanging over its head.  And, unless an

9   immediate sale is done, the value of the

10  premises and the business will be lost.

11          In fact, it will be lost very

12  quickly unless there is a very, very quick

13  sale.

14          The Debtor is not in the position

15  with regard to the Waterfront landlord to pay

16  the rent.  I have been on the phone with Mr.

17  Gatin.  Unfortunately, the premises are open

18  only on a very limited basis at this moment,

19  one time a week.  And, it doesn't have the

20  monies to actively promote and do the things

21  that it has to do in order to increase its

22  revenue.

23          So, if they don't have a sale

24  rather quickly, then the value of the premises

25  will be lost.  The sale price is $2 million,

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2     which we believe is substantially more than the
 3     landlord's claim.  There are counterclaims
 4     against the landlord as well that were pending
 5     in State Court.
 6                    And, the sale, we believe, is in
 7     the best interest of all creditors.  That is
 8     the issue having to do with that, rather.
 9                    With regard to the Limelight
10     landlord, and I find these are also easier to
11     deal with than the names of the company --
12                    THE COURT:  Mr. Campo has The
13     Tunnel.
14                    MR. BACKENROTH:  Right, he has
15     The Tunnel, and the Limelight is Lansdown
16     Entertainment, which is the landlord in part of
17     the investment group that is purchasing the
18     Limelight and the leaseholdings.  The terms of
19     that sale is they must work out their own
20     transaction with the landlord for a new lease,
21     but they are paying $1 million 2, over and
22     above the amount of the leasehold obligations.
23                    And, if it's subject to better
24     and higher offers, the prospective purchaser
25     has asked for a break-up fee and a topping fee,
```

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2        $50,000 in the event that somebody else is the
 3        successful bidder.  And $100,000, that a bid
 4        must be $100,000 better than theirs to beat
 5        their bid.  Those are the two conditions that
 6        they have requested.
 7                    There was also an issue raised in
 8        the papers as to our ability to negotiate with
 9        others.  I would like to clarify that.
10                    We have the right to negotiate
11        with anybody.  All that meant was that up until
12        the point of this hearing, that we would not be
13        negotiating with other parties.  I think even
14        that, to the extent that anybody has called and
15        inquired, we have given them the basic
16        information of what the transaction is.
17                    There isn't an enormous amount of
18        interest, but those people who have expressed
19        some interest in the past, we will notify
20        concerning the sale.
21                    If anybody wants to bid more than
22        what is being offered on the table, we have
23        also provided --
24                    THE COURT:  Let me interrupt you,
25        Mr. Backenroth, because although I reviewed the
```

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2      papers, I didn't review them in the detail

3      necessary to answer every question.

4                  Was the provision that was

5      complained of a no-shop provision or was it

6      stronger, was it like a gag provision, saying

7      that somebody expressed interest, you were

8      supposed to --

9                  MR. BACKENROTH:  No, it simply

10     says that we weren't going to discuss the terms

11     with others, and, in fact, we have.

12                 THE COURT:  It sounds like a gag

13     to me, but you are saying in any event, you

14     have.

15                 MR. BACKENROTH:  Yes, in other

16     words, although that was in there, to the

17     extent anybody has inquired, with other people

18     who have inquired, we have told them what the

19     terms are.  So that, although it is in the

20     modification agreement of that one page, the

21     fact of the matter is, anybody who was willing

22     or expressed an interest, we took the call, and

23     we explained to them what the transaction is.

24                 So, I don't think there has been

25     any prejudice to anybody concerning that.  And,

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2        the purchaser's counsel is here.  He can

 3        confirm that going forward, there is no

 4        inhibition whatsoever against talking to

 5        anybody or giving information or negotiating or

 6        getting a better and higher offer.

 7                   THE COURT:  And, Mr. Campo had

 8        raised in his papers that he may just be aware

 9        of the fact that this lease expires in two

10        years, and we have no intention of renewing it.

11        And, although his client can be forced to

12        swallow and assume and assign, consistent with

13        compliance with the Code, I am not aware of any

14        provision that says his client can be forced to

15        provide a new lease when the lease expires.

16                   MR. BACKENROTH:  Your Honor, we

17        are selling it as is, not subject to an

18        extension of the leasehold interests.  They are

19        buying not only the leasehold interest, but the

20        principal of the Debtor is contributing the

21        name, both Limelight and Tunnel to the sale, so

22        there is added value that is being contributed

23        to the transaction.

24                   THE COURT:  The trademarks are

25        his property, of a public --
```

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2              MR. BACKENROTH:  Yes, a related

3    entity.  And, therefore, that has value as

4    well.  And, that is being added to the

5    transaction, not for altruistic reasons.

6    Obviously, the taxes that would be paid out of

7    the proceeds of these sales are personal

8    obligations of Mr. Gatin.  So, it is to his

9    interest to get the highest amount of money and

10   to pay off the taxes in this transaction.

11             So, he is on the same page from a

12   personal as opposed -- as well as a corporate

13   point of view in getting the transaction done.

14             THE COURT:  Mr. Backenroth, I

15   would like you to pause for a second because I

16   cared about this.

17             Mr. Kennedy, for the

18   government --

19             MR. KENNEDY:  Yes, Your Honor.

20             THE COURT:  -- would your

21   objections be resolved, if your tax liens

22   attached to the proceeds on this?

23             MR. KENNEDY:  To the net proceeds

24   of the sale in the same order and priority as

25   they attached to the assets, yes, they would,

```
 1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2      Your Honor.
 3                  THE COURT:  You are not an
 4      impediment to this?  You will just get your
 5      money from a different source?
 6                  MR. KENNEDY:  Right, we just want
 7      that language to be added to the Order.  We
 8      don't have a particular stake --
 9                  THE COURT:  Are you cool with
10      that, Mr. Backenroth?
11                  MR. BACKENROTH:  Absolutely.  In
12      fact, it would be the case, in any event,
13      because to protect his interests, we would you
14      have to have his rights attached to the
15      proceeds.
16                  THE COURT:  Okay, finish up with
17      your preliminary remarks, Mr. Backenroth.  And,
18      then I want to hear from Ms. Davis on behalf of
19      the U.S. Trustee, Mr. Campo and anybody else
20      who is objecting.
21                  MR. ZIPES:  Your Honor, excuse
22      me, could I move a chair up next to Mr. Davis?
23      I was not expecting --
24                  MS. DAVIS:  I am sorry.
25                  Could we take the one right
```

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    there, I am sorry?  The problem is normally we

3    pinch hit for each other.  Mr. Zipes came back,

4    and this is his case.

5              THE COURT:  Would you like to be

6    excused, Ms. Davis?

7              MS. DAVIS:  Not yet.  Thank you.

8              THE COURT:  Your call, I have

9    nothing against Mr. Zipes.

10             MS. DAVIS:  Okay.

11             MR. ZIPES:  Thank you, Your

12   Honor.

13             THE COURT:  Okay, Mr. Zipes, will

14   you be the principal spokesperson for the U.S.

15   Trustee on this one?

16             MR. ZIPES:  Okay.

17             THE COURT:  Ms. Davis, hand it

18   over and give it to Mr. Zipes.  You can sit, if

19   you want, Mr. Zipes, if it helps you to be

20   heard better.  But, you can finish up, Mr.

21   Backenroth.

22             MR. BACKENROTH:  Yes, Your Honor.

23   Just to summarize some of the points because

24   Mr. Zipes was not here when I made the comments

25   in response to the objections raised from the

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    U.S. Trustee's papers, number one, there will

3    be publications in the newspaper, although,

4    frankly, this property has been on the market

5    for sale and anybody interested -- and the

6    people in this industry are aware of that, but

7    we will publish, and we certainly would like to

8    have an interest in the bidding, if that is

9    something that could happen at the return date.

10    So, there is a modified provision to deal with

11    that particular objection.

12              There is disclosure concerning

13    the principals of both of the purchasers.  None

14    of them have any relationship whatsoever to the

15    Gatins.

16              As disclosed in the moving

17    papers, with regard to Limelight, which is the

18    Lansdown petition, that there is a relationship

19    between the landlord and the purchaser.  The

20    landlord will be part of that group, which,

21    frankly, assists us in the transaction

22    because --

23              THE COURT:  It's a waiver of the

24    rent claim.

25              MR. BACKENROTH:  Exactly, so it's

```
 1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2      a million 2 over and above.  And, they have to
 3      deal with the leasehold situation.  And,
 4      although my moving papers say we estimate the
 5      obligation between a million and a million 1, I
 6      have been informed by the landlord that there
 7      is an Order in State Court that has fixed the
 8      rent at $1 million 6, plus rent as it accrued.
 9                      THE COURT:  This is a State Court
10      Order in contrast to a landlord contention?
11                      MR. BACKENROTH:  Yes, in other
12      words, what happened was there were eviction
13      proceedings in State Court.  I say this by
14      hearsay because I do not have the actual
15      documents in front of me.
16                      THE COURT:  A nonpayment summary
17      proceeding that also gave rise to a money
18      judgment for the background.
19                      MR. BACKENROTH:  Right, by
20      stipulation in which they fixed the amount of
21      the debt at approximately $1 million 6.  The
22      rent runs approximately $100,000 a month.  So,
23      the landlord says that it is approximately 1.8
24      million that is owed on that transaction.
25                          So, the value of the seal, if you
```

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    wanted to look at it that way is, 1.8 million

3    plus the million 2, over and above the million

4    8, with assumption that they will have to

5    satisfy or somehow resolve that particular

6    claim.

7            THE COURT:  But not to guide

8    creditors, but your point is that if X comes

9    off the street, then the lease has to be

10   assumed and assigned, and you have to cure the

11   defaults?

12           MR. BACKENROTH:  Absolutely.  So,

13   somebody will have to come up with 1.8 million

14   as part of that transaction to at least match

15   the offer that is already on the table.

16           So, it's a $3 million offer and

17   not the million 2, because it is in addition to

18   what has to be paid with regard to the lease.

19   So, we would normally have to do it.

20           With regard to the other

21   transaction, that transaction is $2 million all

22   cash deal.  The Wolf group has nothing to do

23   with the Gatins either.  That is a cash and

24   carry.  They would have to assume and assign

25   the lease --

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2                  THE COURT:  Yes, how and when

3      would they satisfy the defaults owing to Mr.

4      Campo's clients?

5                  MR. BACKENROTH:  They would

6      satisfy those defaults at the closing.

7                  THE COURT:  Which is when?

8                  MR. BACKENROTH:  They would have

9      to get the SLA approval on the transfer of the

10     liquor license.  And, we understand that Mr.

11     Wolf is an operator, does have a liquor

12     licenses, and that we believe that he should be

13     an approvable candidate for this, as the other

14     group is as well.

15                  In other words, we only

16     negotiated with people that we believed were in

17     the industry and could get SLA approval without

18     difficulty and have gotten SLA approval.

19                  THE COURT:  Okay, you responded

20     to my question conceptually, but not in terms

21     that could help me better understand how much,

22     and you are asking me to tell Mr. Campo to have

23     his client cool his heels before he gets paid.

24                  MR. BACKENROTH:  I understand.

25     My estimate is that it's the time to get the

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    transaction approved depending on whenever Your

3    Honor gives us in terms of a sale time.  Plus,

4    I think, as I understand, it is about five to

5    six weeks, the proper process concerning the

6    SLA approval.  But, I am not one hundred

7    percent certain.

8                    That is also information given to

9    me, not based on my own knowledge, because I am

10   not an SLA attorney, and I am not that familiar

11   with the way those things operate.  But, that

12   is what has been told to me.

13                   THE COURT:  All right, I want to

14   give other parties in interest a chance to be

15   heard.

16                   MR. MANN:  Your Honor, may I

17   clarify, may I ask you something?

18                   THE COURT:  The SLA, Mr. Mann,

19   could you -- there are a lot of people who want

20   to hear what you have to say.  Could you pull

21   up the mike?

22                   MR. MANN:  Oh, I am sorry.

23                   As regarding the asset purchase

24   agreement with H.C. Entertainment, The Tunnel,

25   I believe the wording of that agreement is that

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2     the closing would take place on a temporary
 3     license, which is a lot quicker than the
 4     permanent license that is being issued.  So, it
 5     would not be five or six weeks.  It would be a
 6     lot sooner because the temporary permanent can
 7     be done in 30 days or less.
 8                    THE COURT:  Okay.
 9                    MR. BACKENROTH:  I would have to
10     defer to counsel.  He knows this issue
11     certainly better than I do.
12                    THE COURT:  Sure, all right.  Let
13     me hear from -- my understanding is that the
14     principal objections, vis-a-vis -- I don't
15     think there is any question on business
16     judgment, in terms of whether the sale was
17     appropriate or desirable for creditors,
18     although I think there is a real question as to
19     how much will be left after priority creditors
20     are taken care of.
21                    But, Mr. Zipes, can I hear from
22     you as to the extent to which Mr. Backenroth
23     has responded to your concerns and the extent
24     to which concerns remain?
25                    MR. ZIPES:  Your Honor, I will
```

```
 1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2      stand up.  Do you want me to go over there?
 3                      THE COURT:  That would be
 4      desirable, if you could.
 5                      MR. ZIPES:  Good afternoon, Your
 6      Honor, Greg Zipes from the Office of the United
 7      States Trustee.
 8                      I apologize for arriving late.  I
 9      was in Court in White Plains.
10                      THE COURT:  Knowing what the U.S.
11      Trustee's Office is juggling nowadays, no
12      apologies are necessary.  Just go to it.
13                      MR. ZIPES:  Your Honor, I think
14      that you had asked whether all issues with
15      respect to business judgment had been
16      satisfied.  And, I wanted to touch on that, and
17      also maybe get into some specifics regarding
18      the procedures Order aspect of there.
19                      I have to warn you that the Order
20      was just presented to us, the procedures Order
21      was presented to us five minutes before the
22      hearing, and we have not had a chance to look
23      at it in depth.
24                      Have no doubt, I have worked with
25      Mr. Backenroth in the past, and I have no doubt
```

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    that to the extent something is missing through

3    a misunderstanding, he would be happy to put

4    that in.

5              Leaving that aside, I have

6    questions about the efficacy of the sale.  And

7    let me turn to H.C. Entertainment first, which

8    is, I guess, The Tunnel.  I noticed H.C.

9    Entertainment.

10              The Debtor had filed a local rule

11    1007 statement.  And in that statement, listed

12    at least preliminarily, this is under oath,

13    assets and liabilities.

14              These assets and liabilities show

15    that, as the Court noted, after the sale and

16    after the payment of liens and the landlord,

17    that there would be, basically, nothing left,

18    administrative expenses would have to be

19    included in that as well.  There would be

20    basically nothing left for unsecured creditors.

21    And, that a plan would not be proposed.

22              I am not sure what the exit

23    strategy of this case would be.  I am not sure

24    how appropriate the use of bankruptcy is just

25    to a sale that would lead to the payment of

1     H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2     creditors that is not incorporated into a plan.

3     That is one concern of the U.S. Trustee and

4     maybe the Debtor can tell us how this will lead

5     to a plan and how this might lead to

6     reorganization or liquidation of the Debtor.

7                    Leaving that aside for the

8     moment, I wanted to turn to the -- and by the

9     way, with the other case, it's a similar

10    situation.  If you look at assets and

11    liabilities of the other one, it's a similar

12    analysis in that the liens would either exceed

13    or come close to the sale price.  I mean,

14    therefore, it is not clear what would be left

15    to fund a plan.

16                    And, I don't think it's a

17    foregone conclusion that when Debtors come in

18    early in the case saying there should be a sale

19    of substantially all the Debtors' assets, that

20    everybody should just let it go and then worry

21    about how to get out of the case later on.

22                    Other parties are obviously

23    frustrated.  And, I guess they would like to

24    see it done as quickly as possible.  But, I

25    think that is a question that needs to be out

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    there.

3              The sale procedure notice, the

4    notice of intended sale, which is attached to

5    the Order, the U.S. Trustee did raise some

6    specific concerns.  And, I am told that, by Mr.

7    Backenroth, that our concerns may have been

8    addressed.

9              I, frankly, have not been able to

10   go through it closely enough.  And, if it's

11   just a matter of tweaking it, then I am sure we

12   can work that out.

13             And, I am happy to hear that the

14   Debtor will cooperate fully in letting

15   potential purchasers and potential bidders see

16   what is in the companies.

17             One of the things that we were

18   concerned about is in one of these cases, there

19   was not a list attached to the contract of sale

20   of the assets that are being sold.  I don't

21   know if that was an oversight or if that was

22   not an oversight.  But, any bidder can see the

23   contract and see the assets listed, and it is

24   very specific, pages and pages of what is

25   located at that location.  They can make an

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    analysis of what the bid should be in that

3    situation.

4              In the other one, I am not sure a

5    bidder coming in and seeing if they want to

6    purchase this property would have that ability.

7              And, so, I think as long as the

8    notice is clear that it doesn't necessarily

9    have to contain a full listing of what the

10   assets are, but it should list what, that any

11   potential bidder shall be permitted to see a

12   list of those assets, and shall be given

13   reasonable access to the premises to inspect

14   the assets, that should be right there in the

15   notice of sale.  And, everybody signed a

16   hundred of these notices of sale and knows that

17   these sort of things should be in there.

18             I am assuming that that will not

19   be controversial with the Debtor to put in a

20   provision like that.

21             I have had -- from the objection,

22   I list a few other items that should be in --

23             THE COURT:  Yes, as to one of

24   them, Mr. Zipes, by the way I should comment

25   because it was at my suggestion.

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2              I have a bid rigging case before

3    me.  I was not enthusiastic about one bidder

4    having access to another bidder or bid

5    information from another bidder.  And I was

6    interested in striking a fair balance between

7    maximizing value for the estate and minimizing

8    the risk of collusive bidding.  And, my thought

9    was that parties in interest in the U.S.

10   Trustee would have access to that information.

11   But, it was at least, preliminarily, a concern

12   that communications between the prospective

13   bidders be minimized.

14              If you or any other party in

15   interest has views with respect to the best way

16   to strike that balance, I am open minded on the

17   issue.

18              MR. ZIPES:  Unless the Debtor has

19   some special reason, you are referring to the

20   Affidavit being filed under seal?

21              THE COURT:  The proof of service

22   for people who are interested in bidding.

23              MR. ZIPES:  I, frankly, have not

24   seen that, myself, too often.  There might be

25   reasons to keep a bidder secret or not known to

H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

1
2      the other bidders.
3                      THE COURT:  Well, this wasn't
4      bidders.  What this was was people who
5      expressed interest.  And, I said that the
6      Debtor could submit a listing of those to whom
7      it had sent notice because they had expressed
8      interest under seal.  So, that people who were,
9      what I would call dormant bidders would, in
10     essence, not have too easy an opportunity to
11     act collusively.
12                      But, if you or any other party in
13     interest thinks it will maximize value with the
14     creditors to do away with that, I have an open
15     mind on the issue.
16                      MR. ZIPES:   Okay.
17                      THE COURT:  I will hear your
18     views, I will hear Mr. Backenroth's views and
19     anybody else's views.
20                      MR. ZIPES:  I think if there is a
21     special concern in this situation about
22     collusion, then, maybe we should consider
23     filing it under seal.  But, I think the
24     assumption in the absence of that is that
25     everything should be open.

1     H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2                    But, that is not a major point of

3     mine.  I am not saying that that is a major

4     issue here.

5                    I think the notice, and, again, I

6     have not read it closely.  I don't know if it

7     addresses that.  The notice seems to make it

8     clear in the H.C. Entertainment, which I guess

9     is The Tunnel case, that what the purchaser

10    would actually be purchasing here -- because

11    the contract of sale, as written, states that

12    tax liens must be satisfied to the satisfaction

13    of the Debtor and Mr. Gatin -- I hope I am

14    pronouncing that word, his name right.

15                   Potential bidders need to know

16    that that is a condition precedent of this sale

17    and this purchaser.  And, they should have the

18    opportunity to bid in, because I think that is

19    a significant concession by the Debtor.  And,

20    it could affect the sale price for other

21    bidders, if they knew that this was a condition

22    precedent to the sale going through.

23                   Now, I have put in my papers,

24    that I think this condition precedent is

25    inappropriate.  And, this condition precedent

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    should not hold up the sale.  And, Mr. Gatin's

3    tax problems with governmental authorities, to

4    the extent the sale is approved, should not be

5    a condition precedent to holding up the sale.

6    He should not be able to hold up the sale in

7    order to extract the deal from the Taxing

8    Authorities.

9         So, that is an aspect that should

10   be decided by this Court of whether this

11   provision should be struck or not from the

12   contract of sale.

13        THE COURT:  One that requires tax

14   obligations.  Are we talking about trust fund

15   taxes, or any kind of taxes or are all the

16   taxes, trust fund --

17        MR. ZIPES:  I make a specific

18   reference to the agreement, Section 8.3.  And,

19   I may have read this wrong, but it appears to

20   me in reading that section, seller and Peter

21   Gatin's tax obligations including the

22   pre-agreement shall have been satisfied on

23   terms satisfactory to the seller.

24        All governmental approval rights

25   for the consummation of this agreement shall be

1     H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2     obtained.

3            This provision with respect to

4     Mr. Gatin gives us a way out that I don't think

5     is appropriate, but it should, in any event, be

6     part of the notice for other potential bidders

7     to know they also have the opportunity to the

8     extent that this provision is left in there, to

9     back out of the agreement, in essence, if

10     nothing is worked out for the Taxing

11     Authorities.

12            Because, see, the sale involves

13     the Debtors, substantially all of the Debtors'

14     assets.  And, with liens to attach to the

15     proceeds of sale, except with respect to the

16     Taxing Authority liens, and, then, it also

17     provides --

18            THE COURT:  Wait, I thought

19     Taxing Authority liens will attach to the

20     proceeds.

21            MR. ZIPES:  Well, that is not

22     what the contract says initially, and if that

23     is the clarification that was made, I guess

24     that resolves my issue.

25            THE COURT:  Mr. Backenroth, why

                1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

                2       don't you let Mr. Zipes speak his piece?

                3                   MR. BACKENROTH:  I was going to

                4       clarify.

                5                   THE COURT:  I am going to hear

                6       from you next because I suspect that some of

                7       his concerns may have been resolved.

                8                   MR. ZIPES:  Let me point out

                9       where I am getting that from.  The agreement in

               10       Section 2, where it says, "The assets will be

               11       sold, committed, transferred, and assigned to

               12       the buyer on a closing date free and clear of

               13       all liens, security interest, mortgages,

               14       claims, restrictions, encumbrances, whatsoever,

               15       except for the federal, state and city and tax

               16       liens."

               17                   So, it is leaving that issue to

               18       be resolved as a condition precedent, as far as

               19       I read this.

               20                   THE COURT:  I understand your

               21       confusion, okay.

               22                   MR. ZIPES:  Now, I should point

               23       out that with the other Debtor, this part of

               24       the agreement was not attached to my papers.

               25       And, I don't know if the same language is in

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
2    that one.  And, perhaps, Mr. Backenroth can
3    confirm whether that is the case or not when he
4    speaks.
5              And, I don't think Mr. Backenroth
6    addressed the break-up fee and overbid amounts.
7    And, there is a standard that needs to be met
8    for the purchaser to get or a bidder to get no
9    break-up fee and an overbid in Integrated
10   Resources, which we cite.  There has to be an
11   issue as to whether there is -- there are
12   several factors.  And, basically, whether this
13   bidder will spur on any bidding.
14             I don't think any showing was
15   made as to whether this bidder is going to spur
16   competitive bidding and is entitled to a
17   $50,000 break-up fee as a result of that.  We
18   have no idea what its expenses are and whether
19   the fee hampers and/or rather incurs bidding.
20   So, Mr. Backenroth should be able to say
21   something about that.
22             The overbid, frankly, is not out
23   of bounds, for the sale price.  So, Your Honor,
24   assuming that we can work on the sale procedure
25   Order with Mr. Backenroth, assuming that he is

```
 1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2      not disagreeing with anything that I am saying,
 3      and assuming that he can meet the business
 4      judgment test, then, I think our objections
 5      will be resolved at that point.
 6                   MS. DAVIS:  I just wanted to add
 7      something for Mr. Zipes that he didn't have the
 8      opportunity to convey, and I was not able to
 9      communicate.
10                   THE COURT:  Ms. Davis, just pull
11      that mike closer.
12                   MS. DAVIS:  I just wanted to add
13      something.  I was not able to communicate with
14      Mr. Zipes.  I am sorry for the confusion.  We
15      normally don't have this in hearings before
16      Your Honor.
17                   And, that is, it is my
18      understanding that the Debtor has not been able
19      to show proof of insurance or has not shown
20      proof of insurance yet.  Typically, in a
21      Chapter 11 case, that is the type of
22      information we would obtain at a Section 341
23      meeting of creditors which, in fact, has been
24      scheduled and has not yet occurred.
25                   We think that is very important
```

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    here.  We have a Debtor that is operating, not

3    on a daily basis, but occasionally, and as Your

4    Honor knows, there is quite a lot of traffic in

5    this club, but perhaps not enough, and that is

6    why they are in bankruptcy, but there is still

7    quite a lot of traffic in these clubs.

8                We think it is imperative that

9    there be some showing before the sale that the

10   Debtor has an interest, and they are meeting

11   certain of their obligations in the Chapter 11

12   before the Court makes certain dispositive

13   rulings on these motions.

14               THE COURT:  Okay, does that take

15   care of what you needed to convey at this

16   point, Mr. Zipes?

17               MR. ZIPES:  I think it does for

18   now.

19               THE COURT:  Mr. Backenroth?

20               MR. BACKENROTH:  Yes, first of

21   all, with regard to the Limelight, we didn't

22   have the list, at the time we filed the papers,

23   of the couches, chairs, tables.  I understand

24   that such a list is available, and we will make

25   that available.

H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

1

2          As Your Honor knows, in a case of
3     this nature, furniture, chairs are not the real
4     estate that one sells.  What one sells is the
5     leasehold interest, the name, the location,
6     that is the real guts of it.

7          But, certainly, it would be made
8     available for anybody to observe, to take a
9     head count.  But, we have a list available, so
10    that issue is not an issue.

11         With regard to the provisions
12    concerning Mr. Gatin's necessity to be involved
13    in the determination of whether the tax liens
14    are paid or aren't paid, Your Honor has to
15    understand that the contract, itself, was
16    prepared initially not as part of or in a
17    bankruptcy context.  It was prepared with the
18    assumption that one would close outside of the
19    bankruptcy context.  And, one would have to
20    resolve tax liens when one sits down at a
21    closing.  And, one would have to negotiate with
22    the Taxing Authorities in the event that there
23    is not enough money to resolve those claims.

24         Since the approach of the 11 is a
25    sale free and clear of all liens, encumbrances

         H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

1        and claims, with the rights to attach to the

2        proceeds.  And, we believe that the Taxing

3        Authorities will go along with the sale, even

4        if it doesn't one hundred percent cover the

5        claims, maybe it covers eighty percent or

6        ninety percent.  It's certainly very close

7        because the claims are spill-over claims, the

8        same tax claims against both estates.

9                        So, there is about a million and

10       a half owed to New York State, I believe.

11       About 500,000 owed to the IRS.  And, if all

12       goes well and we need to sell it as I expect to

13       do, there is a million 2 on one portion of it,

14       and we believe that there is more than

15       $800,000.

16                        THE COURT:  Are these 941

17       withholding and state --

18                        MR. BACKENROTH:  Yes, exactly.

19       They are the same obligation.  In other words,

20       the obligation of Mr. Gatin and the obligation

21       of the corporate entities are one and the same.

22       So we are not talking about personal tax

23       obligations.  We are talking about obligations

24       that were generated by the businesses.

```
 1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2                    THE COURT:  For which Mr. Gatin
 3      is on the hook to the extent they are not
 4      satisfied?
 5                    MR. BACKENROTH:  Absolutely.
 6      And, I want that satisfied.  And, I think that
 7      when you look at that clause in the context of
 8      a non-bankruptcy sale, one could appreciate
 9      that someone who wants to have those taxes
10      resolved wants to make sure he has some
11      control.
12                    But, given the fact we have a
13      sale free and clear, I think that is really no
14      longer an issue.
15                    We will sell it.  Whatever is
16      there, available, assuming the Taxing
17      Authorities will not object to the sale because
18      it does not cover one hundred percent or ninety
19      percent, I think that is no longer an issue.
20                    THE COURT:  So, you're optimistic
21      or comfortable that the prototype contract can
22      be modified to moot out that issue.
23                    MR. BACKENROTH:  That is right.
24      It was a non-bankruptcy type of issue that was
25      created in the different contexts.
```

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2                  Finally, with regard to the

3    insurance, I didn't inquire about the

4    insurance.  It is the first time it has been

5    raised.  I will call the client and find out if

6    he has insurance and provide him with a

7    certificate of insurance.

8                  THE COURT:  Why don't you make an

9    offer of proof, unless the U.S. Trustee wants

10   more than that, explaining to me and to parties

11   in interest and to the U.S. Trustee, the

12   Debtors' business judgment for wanting to sell

13   now, why it's selling and the manner in which

14   it is selling, and why it believes a break-up

15   fee is appropriate?

16                  MR. ZIPES:  Your Honor, I would

17   accept an offer of proof.  But, I would want

18   cross-examination.

19                  THE COURT:  We will reserve your

20   rights in that regard.

21                  MR. BACKENROTH:  Let's deal with

22   the Limelight first.  With regard to the

23   Limelight, there is a stipulation in State

24   Court that requires the sale --

25                  THE COURT:  Before you begin

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2       again, Mr. Backenroth, if called upon to
 3       testify, who would say what you're telling me?
 4                   MR. BACKENROTH:  It would be Mr.
 5       Gatin.  I would have to call him down here, and
 6       he would be the one to testify concerning these
 7       things.
 8                   THE COURT:  Okay.
 9                   MR. BACKENROTH:  With regard to
10       the Limelight, let's deal with that first, as I
11       understand it, there is a stipulation in State
12       Court which not only fixes the amount of the
13       obligation of $1 million 6, but requires that
14       the sale take place within 90 days, otherwise,
15       the leasehold interest would terminate.
16                   Since what, the primary interest,
17       assets that you sell in this kind of a context
18       is the leasehold interest, the failure to sell
19       the property would mean, as a practical matter,
20       that one would lose the property.
21                   THE COURT:  How much time is left
22       of that ninety days, as we speak here?
23                   MR. BACKENROTH:  I would believe
24       to the beginning or the middle of August.  I
25       don't have the exact date, but we could
```

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    schedule the sale and counsel for the landlord

3    is over here.  So I can coordinate that date so

4    that we have --

5              THE COURT:  Assume if the

6    landlord wins the bidding, he can wave his gun

7    to your head.  And, I don't think there is a

8    real problem, but if a sale is not approved or

9    a sale is not teed up within a relatively short

10   period of time, it would be the landlord's

11   prerogative to at least argue that the

12   leasehold has terminated in accordance with the

13   terms of the lease as modified.  And, that,

14   consequently, we may not have anything to sell

15   whatsoever.

16              And his negotiating position

17   would be a lot different under the context

18   where we can, over his objections if we had to,

19   imitate or go for a sale of the property and

20   assume and assign the lease, which would have

21   been an alternative for the same manner in

22   which there was instruction over here.

23              So, we have a short deadline.

24   The landlord has not been paid the rent that

25   it's owed.  And, consequently, we are at a risk

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2        that a motion would be made by this landlord,

 3        we are talking about the Limelight, to

 4        terminate the lease for nonpayment of rent.

 5        So, that issue is also outstanding.

 6                    The Debtors' operations,

 7        themselves, are being kept at a minimum level,

 8        merely to maintain the continuity of the

 9        leasehold interest, and the continuity of the

10        liquor license, long enough so that we can sell

11        the premises.  It is not making money.  It is

12        barely covering expenses.  And, it is not

13        generating enough money to pay the rent in

14        either one of the instances, not in the

15        Limelight and not in The Tunnel.

16                    THE COURT:  Am I correct that the

17        Limelight landlord isn't getting paid anymore

18        on his postpetition rent of Mr. Campo's  --

19                    MR. BACKENROTH:  I don't know.  I

20        cannot answer that.

21                    THE COURT:  I think Mr. Campo's

22        point is he is not getting anything.

23                    MR. BACKENROTH:  I understand,

24        but the operations may not be the same.  One

25        may generate more money than the other.  I
```

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    don't have an answer to that.

3                 In other words, I did call about

4    The Tunnel specifically because the issue was

5    raised by Mr. Campo as to what the availability

6    was with the funds, to make any payment on

7    behalf of that.

8                 Right now they have approximately

9    $20,000 in the bank account.  They tell me that

10   is necessary for the purchasing of liquor and

11   for paying to operate.  They are only open once

12   a week.  And, they are generating approximately

13   20-some-odd thousand dollars on that day,

14   wherein, in the past, they generated like

15   $200,000 a week.  So, there is a very big

16   difference in its operations.

17                As I said, it is being maintained

18   solely for the purpose to get the sale done and

19   transfer the liquor license.  And, it is an

20   entirely different procedure for the liquor

21   license, it was terminated, and they are

22   closed, as opposed to transferring an existing

23   liquor license.  And, of course, there are all

24   kinds of problems with the SLA.

25                I mean, the petition was

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2      triggered because there was a determination in

3      the SLA, in its internal administrative

4      procedures that -- not to continue the liquor

5      license.  That was not served upon the Debtor,

6      and it was not effective until served.  And,

7      that is one of the reasons why we filed the

8      petition.

9              The SLA has taken the position,

10     and, in fact, there is a motion pending, I

11     think it is returnable on the 18th, to have a

12     determination by this Court that as an

13     exception to the automatic stay provision, that

14     they could terminate the liquor license even

15     today.

16             So, we are at a risk that the

17     entire thing may go down the tubes if we don't

18     act quickly to do the sale.  And, the SLA has

19     very little patience for this Debtor.  They

20     have been in protracted litigation with them

21     over many, many years, in many, many Courts.

22     This is a very highly, publicity charged type

23     of case.

24             Just a few days ago, Mr. Gatin

25     was on the front page of the New York Post.

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    And, I think he continues to be on the front

3    page of the New York Post on many occasions.

4    And, it is something that has to be brought to

5    a conclusion quickly, otherwise, there will be

6    nothing to sell.

7                    Finally, as I said, the

8    operations are minimal at this moment.  They

9    are being held together solely to effectuate

10   the sale.  Any one of these things could

11   terminate the ability to sell, could terminate

12   the ability to realize substantial funds out of

13   these assets.

14                  THE COURT:  Now, I can appreciate

15   the comment that there may or may not be funds

16   for general creditors, but I didn't set the

17   priorities of the Bankruptcy Code.  I didn't

18   set the laws to honor the rights of lien

19   creditors.  The Taxing Authorities are both

20   lien creditors.

21                  To honor the rights of landlords

22   who are entitled to be paid as a part of the

23   assumption and assignment and lease, we can

24   only do what we can do with the assets that we

25   have.  And, we have a responsibility to save

H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

what we can save under the circumstances.  And
we, because we have so many things closing on
the Debtor and because of the limited funds
that are available to the Debtor, I would ask
that the Court determine that at least in the
business judgment of the Debtor, if it would be
appropriate to sell and that that satisfies the
Lionel standard and the Pure Pet Oil(sic.)
standard.  We are talking about a wasting oil
asset, an asset that will become a value, a
zero value, unless there is an immediate sale.

I don't believe that, on the
other hand, if we have an immediate sale, and
we now make arrangements for the transfer of
the liquor license where there is a new
operator in place, that we will have the
cooperation of the SLA in moving that out
because I believe that their objective has been
to move Mr. Gatin out.  And, with Mr. Gatin out
of the picture, I think that they would have no
objections to a sale because, in fact, they are
the primary beneficiary of the sale.

So, there are a lot of good
reasons to have the sale quickly.  And a lot of

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    good business reasons that if we don't have the

3    sale quickly, we won't have a sale at all, any

4    assets at all.

5              So, I think the Debtor has

6    exercised its proper business judgment in

7    determining that this Court should move very

8    quickly and schedule a very quick sale with

9    regard to this property.

10              THE COURT:  I gathered you flowed

11   from a discussion that was applicable to the

12   Limelight along to a discussion that was

13   applicable to both Debtors.

14              MR. BACKENROTH:  That is correct.

15              THE COURT:  Is there anything

16   with respect to The Tunnel, uniquely applicable

17   to The Tunnel, that is appropriate for

18   comments --

19              MR. BACKENROTH:  There are

20   substantial claims of the landlord as there are

21   in the other situation.  And, we have not paid

22   postpetition rent, which means we are in

23   jeopardy of having the leasehold interest

24   terminated and the lifting of the stay.

25              So, unless we have an immediate

```
1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2     sale, we may not have any Affidavit whatsoever.

3                   As I said to the Court, by

4     Limelight and it means the same thing for the

5     Tunnel, it didn't generate sufficient funds to

6     pay the leasehold operations and, therefore, we

7     are in jeopardy of losing everything based upon

8     that as well.

9                   THE COURT:  Okay, now, talk about

10    the break-up fee and the business judgment,

11    believing that one is appropriate --

12                  MR. BACKENROTH:  Yes, I think

13    that --

14                  THE COURT:  Take any greater

15    resources as a road map.

16                  MR. BACKENROTH:  I understand.

17                  Your Honor, I think that, first

18    of all, we have a publicity charged type of

19    case, a case where there is much publicity

20    surrounding it.  And, if somebody actually

21    steps up to the plate and is prepared to go

22    forward, I think that will get other people who

23    have been floating around and who have not yet

24    moved, to make firm bids and to step forward.

25                  In order to give an incentive for
```

```
 1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2      somebody to be, in essence, the stalking horse,
 3      they are to know that they there are covered
 4      for their legal fees, their expenses of due
 5      diligence.
 6                  They obtained counsel.  They have
 7      negotiated a contract.  They have negotiated
 8      with the landlord.  There are probably
 9      financings, architecture, fees involved,
10      because they intend to do renovations in the
11      place.
12                  There is a lot of due diligence
13      and a lot of work that goes into this
14      transaction.  And certainly they should be
15      entitled to -- I believe it's a $50,000 figure,
16      which is a negotiated figure.  I don't think it
17      is an extraordinary amount for all of those
18      types of things.
19                  THE COURT:  50,000 bucks out of 2
20      million on one and 3 million on the other?
21                  MR. BACKENROTH:  Yes.
22                  No, the other one there is no --
23      excuse me, Your Honor, there is no break-up fee
24      on the other one.
25                  THE COURT:  No break-up fee to
```

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2        the landlord, to the landlord purchaser, the

 3        landlord affiliate purchaser?

 4                        MR. BACKENROTH:  The Limelight

 5        has a break-up fee.  The Tunnel does not.

 6                        THE COURT:  No break-up fee on

 7        The Tunnel?

 8                        MR. BACKENROTH:  Right, The

 9        Tunnel is just a straight over the top

10        transaction.

11                        THE COURT:  The Limelight, which

12        is with the landlord's affiliate, it is $50,000

13        out of an aggregate consideration, which a

14        competing bidder would have to put up 3 million

15        to also cover cure costs.

16                        MR. BACKENROTH:  In essence, what

17        he would have to do is step forward and pay $1

18        million 8 or negotiate a separate deal with the

19        landlord if he wants to do that.

20                        So, basically, it is $3 million.

21        If you want to look at the million 8 plus

22        million 2 on the Limelight, it is approximately

23        3 million on the Limelight and a $50,000

24        break-up fee and $100,000 topping fee.  I don't

25        think that is an extraordinary break-up fee or
```

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2       topping fee under the circumstances.

3                   THE COURT:  Mr. Zipes, to what

4       extent do you have a desire to either ask

5       further questions of Mr. Backenroth or to

6       cross-examine?

7                   MR. ZIPES:  Your Honor, I

8       actually think it might be appropriate to hear

9       what other parties have to say, reserving my

10      rights.  Because I don't think that this Debtor

11      has addressed Lionel, the Lionel factors which

12      are laid out in the objection.

13                  THE COURT:  I think he did.  I

14      think he either used the words, or in

15      substance, wasting asset, which is what I

16      needed to hear to satisfy Lionel concerns.

17      And, I must say that of your various concerns,

18      I was more impressed by the other ones than the

19      Lionel issues because I am concerned about this

20      being a wasting asset.

21                  Mr. Mann has not spoken, nor has

22      he needed to speak, but I do not expect

23      indefinite patience from the SLA.  I do not

24      expect indefinite patience from the landlords,

25      especially Mr. Campo.

H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

And, the point you had made with respect to an exit strategy, the question that needs to be out there, I agree that it's a question that needs to be out there, but I'm not sure if there is an answer that is out there as easily, as an attempt to answer.

And, what concerns me is that while I would grant that the IRS doesn't engender as much sympathy as a creditor, as a general unsecured mom and pop vendor, they are still a creditor, and the amount that is available, even for priority creditors, decreases with time if we cannot convert whatever going concern value there is in this estate, into money for whoever the creditors are.  And, I am constrained to agree with Mr. Backenroth, that nobody in this room has the power to trump the priorities imposed under the Code.

MR. ZIPES:  Your Honor, I agree that at this early stage it is somewhat difficult to predict how this case will pan out.

Normally, a Debtor will, for

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2      example, represent that there is some

3      possibility of a distribution to unsecured

4      creditors, and, therefore, there is a

5      possibility of a plan.  That is a factor of

6      Lionel, in addition to wasting assets, which I

7      agree is a factor as well.  And, I didn't hear

8      that.  And, then, perhaps that representation,

9      I didn't hear how this gets to some sort of a

10     plan or --

11              THE COURT:  I am not sure if

12     anybody could truthfully represent that to me.

13     But, alternatively, it seems to me we would

14     have two other suggestions, neither of which is

15     foreign to your office, convert or dismiss.  If

16     we convert, the money is going to go to the

17     same people that it's going to go to now,

18     except that we are going to have to figure out

19     how we are going to fairly compensate a Chapter

20     7 Trustee and/or decrease the amount

21     distributable to creditors after the Chapter 7

22     Trustee gets paid.  And, if we dismiss it, the

23     lien creditors will get their money.

24              So, where as here, I think the

25     Debtor is trying in good faith to maximize

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2     value, I am skeptical as to how much more we
 3     can expect of them, but I don't want to cut you
 4     off, and I think your idea of whatever, to hear
 5     from other creditors or other parties in
 6     interest is a constructive one.
 7                  Would you like to yield for
 8     others to be heard then, Mr. Zipes?
 9                  MR. ZIPES:  Yes, that is fine.  I
10     had some -- I have some other concerns.  I will
11     hold off on them.
12                  THE COURT:  Well, whenever.  If
13     you want to wait.
14                  All right, does anybody else want
15     to be heard?  Mr. Campo?
16                  MR. CAMPO:  Thank you, Your
17     Honor.
18                  Your Honor, let me first start
19     out by saying that I would assume that the
20     offer or the proffer, rather, by Mr. Backenroth
21     and the offer to Mr. Zipes to ask questions
22     would pertain to other parties here as well?
23                  THE COURT:  Of course, thank you.
24                  MR. CAMPO:  Your Honor, let me
25     start out by saying that at the outset, it
```

```
 1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2      isn't Waterfront's desire to stand in the way
 3      of a prompt sale of these assets.
 4                      And, in fact, Waterfront believes
 5      that the Debtor is coming into bankruptcy.
 6      They have moved forward.  They have asked for
 7      an expeditious hearing in connection with a
 8      sale of these assets.
 9                      Waterfront supports that to the
10      extent that there is a real buyer out there who
11      will pay real value for the assets of The
12      Tunnel.
13                      The questions or the concerns
14      that Waterfront has, Your Honor, really relate
15      to the history of the relationship.  Not that
16      we are going to revisit history, Your Honor.
17      But, the fact of the matter is that this Debtor
18      has, in the past, used various Courts to delay
19      in paying the ultimate obligations that it has
20      to the landlord under this lease.  And, that is
21      why we are standing here with a claim in excess
22      of $1.3 million of just rent and --
23                      THE COURT:  Prepetition.
24                      MR. CAMPO:  Prepetition plus
25      attorneys' fees.  And, Your Honor, we are
```

```
 1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2      standing here today with over $105,000 owed
 3      postpetition.  And, we, frankly, can't
 4      understand how it is that Mr. Gatin can come --
 5      and I say Mr. Gatin, and I don't mean to refer
 6      to Mr. Gatin as the Debtor.  But, as the
 7      operator, the owner, operator of The Tunnel,
 8      can come before another tribunal and say to the
 9      landlord, "Wait, you are not getting paid." We
10      have been hearing that for a long period of
11      time.  And, we think that it's not fair to run
12      over this landlord's rights and to create a
13      scenario where this landlord is being forced to
14      be a lender to this Debtor in Possession.
15      Particularly, we have very serious concerns as
16      to whether there will be any assumption and
17      assignment of The Tunnel.
18                  Let me point out something to
19      you, Your Honor, Mr. Victor is here on behalf
20      of the purchaser of the Limelight.
21                  I do not see Mr. Wolf or a
22      representative from Mr. Wolf here as the
23      purchaser of The Tunnel.
24                  This agreement was executed six
25      months ago.  My client was told the day before
```

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    the bankruptcy was filed by Mr. Gatin that the

3    Wolf deal was, quote, dead, and that they were

4    going to bring another purchaser to the table.

5              We told them, show us the

6    purchaser, tell us what you have, put a

7    proposal before us.  We would be more than

8    willing to listen.

9              It never happened, Your Honor.

10             The Wolf deal is a mix.  There is

11   no indication that this deal is real, and we

12   really question whether or not this Debtor can

13   go forward and sell it.  Not that we don't want

14   the Debtor to sell it.

15             THE COURT:  I am sure you would

16   like nothing better, especially if you are only

17   on the hook for two years and getting 1.3 in

18   prepetition rent paid as part of the cure.

19             MR. CAMPO:  Absolutely, but the

20   problem is there just doesn't seem to be any

21   real feasibility to this proposal.

22             Let me point out to you that

23   there are 22 months left in this lease, which

24   Your Honor noted, and we are not extending it.

25             It is our understanding, and Mr.

1     H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2     Mann can speak to this issue, that the SLA will

3     not issue a liquor license to a purchaser

4     unless there is at least two years left on a

5     lease.

6               So, we question, now, when Mr.

7     Backenroth stands up and says this deal is

8     subject to SLA approval, whether or not you can

9     ever obtain that SLA approval.

10              Your Honor, we have raised in our

11    objection various issues that need to be

12    addressed in connection with any assumption and

13    assignment.  Not only the monetary arrearages

14    need to be cured, but there are serious

15    non-monetary defaults.

16              The insurance, Your Honor, we

17    have been asking for the insurance proof for

18    months.  We have never gotten it.

19              Since the filing --

20              THE COURT:  Excuse me, Mr. Campo,

21    we are talking about liability insurance,

22    casualty insurance or both?

23              MR. CAMPO:  We are talking about

24    both, Your Honor, liability insurance, casualty

25    insurance and dry max(sic.) insurance.

```
 1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2              THE COURT:  Dry max being a

 3      special kind of liability when you sell liquor?

 4              MR. CAMPO:  When people consume

 5      alcohol on your premises.

 6              Notwithstanding the fact that we

 7      requested it, no proof has been forthcoming.

 8      Since the filing of the petition, we requested

 9      it and no proof has been forthcoming.

10              The U.S. Trustee has raised the

11      issue here for the first time, Your Honor, but

12      we join in raising that issue because we have

13      no indication that there is any insurance with

14      respect to this operation.

15              With respect to Mr. Backenroth's

16      statement that The Tunnel is operated only once

17      a week, The Tunnel only operated once a week

18      historically.  The Tunnel is only open on

19      weekends.  It doesn't operate during the week

20      except for some unique special events like the

21      4th of July in which they opened up on the eve

22      of the 4th, on the evening of July 3rd and

23      closed on the morning of July 5th.  And, during

24      that time, thousands of patrons went into The

25      Tunnel.
```

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2                Now, we can't speculate as to how

3      much they generated in revenues that date, but

4      we understand that they charge, just a cover

5      charge of somewhere between 20 to $40 per

6      person.

7                On the assumption that 5 or 6 or

8      7,000 people went through the Tunnel during

9      that period, and it is not an outrageous

10     assumption because they had to have police

11     barricades outside in order to control the

12     crowds.  And, that is what The Tunnel -- The

13     Tunnel is one of the largest, if not the

14     largest nightclub in all of New York City.

15     And, they get, as a matter of course, in big

16     weekends, thousands of people, through The

17     Tunnel, and with paying cover, consuming

18     alcohol, we find it mind-boggling that there is

19     only $20,000 in the estate and that we can't

20     get paid our rent.

21                Your Honor, as I mentioned, there

22     are some very serious issues that we raised

23     with respect to the Wolf agreement.  The SLA

24     needs to approve the transaction.  The fact

25     that there is less than two years on the lease,

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    and, therefore, unless the SLA is going to

3    stand up and represent that they are going to

4    waive their own requirements, we don't

5    understand how any purchaser is going to get

6    that SLA approval.

7              There are provisions in that

8    agreement which provide that escrow agents are

9    going to hold money in non-interest bearing

10   accounts.  That attorneys' fees are going to be

11   paid at the closing, before any Court approves

12   it.

13             Now, granted, we understand that

14   this agreement was executed, but there is no

15   indication that this purchaser or any other

16   purchaser was moving forward on terms that are

17   consistent with Section 363 and the other

18   provisions of the Bankruptcy Code, as well as

19   Section 365.

20             Your Honor, the Wolf agreement

21   has a provision that says that Wolf won't

22   accept amendments, certain amendments to the

23   lease.

24             Now, the lease as defined and as

25   constituted is the lease as amended from time

         H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

1        to time.  Pursuant to certain of those

2        amendments, the Debtor asked the landlord, my

3        client, for additional space.  My client was

4        reluctant to give them additional space, but

5        gave it to them with a specific contractual

6        right to take the space back, if the landlord

7        needed the space.

8                     The landlord has executed its

9        take-back rights with respect to two amendments

10       that the landlord granted to the Debtor during

11       a term of the amendments to the lease; one, a

12       December 1992 amendment, in which they were

13       granted additional space, another, in October

14       of 1995.

15                    THE COURT:  Those being the

16       take-backs or the amendments that gave your

17       client the right to take back?

18                    MR. CAMPO:  The attempts were to

19       give, the attempts specifically gave the

20       additional space, but reserved the --

21                    THE COURT:  The take-back rights.

22                    MR. CAMPO:  It had take-back

23       rights within.  They were negotiated with the

24       Debtor.

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2                    THE COURT:  And, you are saying

 3        that it's your understanding that Wolf says

 4        that he is not going to abide by those

 5        amendments?

 6                    MR. CAMPO:  If you look at the

 7        agreement, Your Honor, if you look at Section

 8        9.5 of the Wolf agreement, this was page 13 of

 9        the agreement, it states "national buyer,"

10        after it states that the buyer shall have

11        obtained consent of the landlord to the

12        assignment, et cetera, and the landlord shall

13        acknowledge that the lease is in full force and

14        effect.

15                    The next sentence says, "Any

16        amendment to the lease decreasing the tenant

17        space, and/or increasing the rent is the result

18        of the transfer, shall be null and void unless

19        agreed to by the buyer."

20                    THE COURT:  I will invite Mr.

21        Backenroth to respond.  I will have to assume

22        this is an amendment entered into after the

23        date of this contract and before the date of

24        the closing.  I would also assume the buyer has

25        to take the lease as it exists, essentially,
```

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    from the context of the bankruptcy case.

3              MR. CAMPO:  We would assume that,

4    Your Honor, although, frankly, the agreement

5    does not state that.

6              Your Honor, as we have indicated

7    to you before, we want all prospective

8    purchasers.  And, we invite the Debtor to come

9    to us with bidders.  And, we have from time to

10   time, and we continue to.

11             But, we want all bidders to

12   understand what it is that they are getting

13   with respect to this lease, what it is that

14   their obligations are with respect to the

15   lease, particularly as it provides for

16   assurances.

17             There are provisions under the

18   lease in which the tenant under the lease must

19   indemnify the landlord for claims.  And, the

20   reason for that, Your Honor, was very specific.

21   At the time that the lease was negotiated, we

22   knew that the Tunnel was going to be used as a

23   nightclub.

24             THE COURT:  Your client doesn't

25   want to be on the hook for bad things that

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2      happen and for which your client could get

3      snared into, so to speak?

4                    MR. CAMPO:  Your Honor, as a

5      point of fact, during a period of time,

6      prepetition, the tenant allowed the insurance

7      to lapse.

8                    During that period of time, some

9      very severe incidents, accidents occurred.

10     There was a death at The Tunnel, a patron died.

11     There were shootings.  My client is now in the

12     middle of potential claims against them for the

13     personal injury of patrons at The Tunnel simply

14     because the tenant has failed to procure the

15     necessary insurance.  And, right now, we have

16     no idea if there is any insurance.

17                   Your Honor, as I said, the lease

18     appears to be -- Mr. Wolf would want to

19     cherry-pick the lease.  We are just not going

20     to allow that to happen.

21                   THE COURT:  I don't think the

22     Bankruptcy Code allows that to happen.

23                   MR. CAMPO:  We agree.

24                   THE COURT:  Turn to the payment

25     of your postpetition rent, Mr. Campo, and

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2        whether, if your other concerns were satisfied,
 3        if there could be a means, if, indeed, you are
 4        going to get paid, your whole million 3 and the
 5        postpetition accrues through the date of
 6        closing, whether there is a way to skin the cat
 7        in that regard.
 8                    MR. CAMPO:  Before I address
 9        that, let me just state that the million 3 is
10        the rent and the late charges.  There are
11        attorneys' fees which are quite substantial
12        because there has been a very long history of
13        litigation with Mr. Gatin.
14                    THE COURT:  Those attorneys' fees
15        being principally in State Court summary
16        proceedings and that kind of stuff?
17                    MR. CAMPO:  Absolutely, Your
18        Honor.  But, they are not insufficient.  The
19        attorney fees didn't accrue.  They are merely a
20        half a million dollars.
21                    We understand that that would be
22        subject to a determination of reasonableness.
23        But, it is not just the million 3.  It's a
24        million 3, plus the attorneys' fees or some
25        portion of it that would have to be determined
```

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    by this Court as being reasonable, as part of

3    the cure.

4                    As to the postpetition rent, Your

5    Honor, frankly, and, this is why I asked the

6    question, I would invite Mr. Gatin to come and

7    tell us where the money is.  I would like to

8    ask Mr. Gatin where the money is, Your Honor,

9    because I don't understand.  Because it seems

10   to me that from the cover alone, from their

11   July 4th party, they would have generated

12   hundreds of thousands of dollars of revenue

13   without the liquor.  We would like to know

14   where is this money.  I don't hear anything

15   here.

16                    Your Honor, I know this is a very

17   early stage of this case.  There hasn't been a

18   341(a) meeting, despite the fact that we have

19   indicated the willingness to serve on the

20   Creditors Committee.  There apparently aren't

21   enough other interested creditors for the U.S.

22   Trustee to appoint one.

23                    I know Your Honor can schedule a

24   status conference.  I would like to have Mr.

25   Gatin down here and I would like to ask him

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    where is the money.

3                    I would like to see Mr. Wolf and

4    I would like him to tell the Court that he is

5    moving forward with this agreement, with all of

6    the necessary modifications that would have to

7    be taken into effect, given the fact that this

8    agreement is now an agreement that the Debtor

9    is going to propose be approved as part of this

10   Debtors' bankruptcy, understanding that a lot

11   of the provisions in here won't be able to be

12   part of an agreement that is in a bankruptcy

13   proceeding.  And, I would like to know where

14   Mr. Wolf is.

15                   I suspect, Your Honor, Mr. Wolf

16   is not here because Mr. Wolf does not exist

17   anymore.  I see the purchaser for the Limelight

18   here, and they are asking for the appropriate

19   things that a purchaser would ask for, i.e.,

20   give me some bid protection.  I don't see Mr.

21   Wolf asking for it because I don't think he

22   exists.

23                   Your Honor, irrespective of that,

24   on the assumption that we could get the

25   appropriate assurances that we would get

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2      completely cured, monetary and non-monetary

3      defaults, and we can get our postpetition rent

4      as it comes due, we will not stand in the way

5      of this Debtor attempting to assume and assign

6      this lease.

7               But, at this given moment, we

8      have no assurances that any of that is going to

9      take place.  And, frankly, we don't even know

10     whether or not this deal is even a real deal to

11     go forward.

12              As I said, there is an escrow

13     agent here, under this agreement, it's Stroock,

14     Stroock & Lavan.  They are not here.  They are

15     or they, at least prepetition, were corporate

16     counsel to H.C. Entertainment.

17              I don't know what is happening

18     with Stroock in connection with this case.  I

19     don't -- at one point, I was under the

20     impression they were going to be retained.  I

21     understand they are not.  I understand there

22     may be some conflict questions.  That is why

23     they are not being retained.

24              But, at this point, Your Honor,

25     we have no comfort that the Wolf deal is a real

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    deal.  And, we have no comfort that Wolf or any

3    other purchaser, as it was willing to abide the

4    terms of the lease, and, in particular, Your

5    Honor, if you would read our objection

6    paragraph, the last paragraph, we set forth

7    specifically the types of things that have to

8    be cured in connection with an assumption and

9    assignment of the lease.

10                   As to the issue of postpetition

11   rent, Your Honor, we absolutely would request

12   that the Debtor come down and explain to us, if

13   we are going to be told that we are not going

14   to get the rent, we want to hear why we are not

15   getting the rent.  We have not heard anything

16   that is satisfactory to us other than to tell

17   us that the Debtor just can't do it because it

18   has limited operations.  This is the Debtors'

19   historic operations.  They don't operate the

20   nightclub during the week, except when they

21   have special events, holidays and things of

22   that sort, and, for example, during Christmas

23   vacation and things of that sort, when they

24   can, when there are a lot of potential patrons

25   around who are home from school break and

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2      stuff.  But, otherwise, this nightclub
 3      operation is on the weekend, and that is it.
 4                  So, they say that they are
 5      running limited, because they are only
 6      operating once a week, that is not quite
 7      accurate because they only operate once a week.
 8      We would like to hear where the money is.
 9                  THE COURT:  Mr. Backenroth, I
10      think you need to respond.
11                  MR. BACKENROTH:  Yes, first of
12      all, when I said that they are operating
13      limited, they are operating limited.
14                  THE COURT:  That is the least of
15      the things that Mr. Campo mentioned that you
16      have to respond to.
17                  MR. BACKENROTH:  Well, I can take
18      it from the top.  As far as we know, the deal
19      is real.  We are asking for a quick sale date.
20      They have the right, by the way, to get a
21      temporary license.  And, even though there is
22      not two years left on the lease, they can do
23      that.
24                  That deal is subject to a
25      temporary license, not to a permanent one.  So,
```

```
 1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2      the proof in the pudding is will they or will

 3      they not close.  And, if Your Honor schedules a

 4      sale on two or three weeks' notice, if they

 5      don't close, that is the end of it.  If they do

 6      close, then they have gotten a considerable

 7      amount of money that they otherwise would not

 8      get.

 9                     Talking about the right to take

10      back the property in the event of a transfer, I

11      think is unenforcible under the Bankruptcy

12      Code.

13                     If it's triggered by the

14      assignment, all that says is that the landlord

15      can take back space merely because of the

16      assumption and assignment of the lease.  That

17      would not be enforcible.

18                     THE COURT:  I don't think that is

19      really what we are talking about.  Do you

20      understand, or I guess, more importantly, does

21      Mr. Wolf understand that when I approve an

22      assignment, an assumption and assignment of a

23      lease, it is the lease as amended, the lease as

24      it exists.

25                     MR. BACKENROTH:  It is as is.
```

```
 1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2       The contract does not say anything different.
 3                    THE COURT:  How do you read the
 4       language that Mr. Campo quoted?
 5                    MR. BACKENROTH:  What Mr. Campo
 6       quoted was that in the event there is a
 7       take-back of the premises because of the
 8       assignment, then that would terminate the
 9       agreement.  But, a take-back of property
10       because of an assignment is enforced -- could
11       not be enforced under the provisions of the
12       Bankruptcy Code because it is an
13       anti-assignment type of provision.  That is all
14       that that says.
15                    It says if I lose space because
16       of the assignment, then that would terminate
17       the agreement.
18                    THE COURT:  Mr. Backenroth, I am
19       trying to meet you halfway on this, at least
20       understanding your needs and concerns.  But, I
21       have trouble seeing how you can say that a
22       contract was entered into months before the
23       filing of the bankruptcy case, that had a
24       provision in it that was intended to deal with
25       a 365(f) situation.
```

```
 1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2                  MR. BACKENROTH:  It just simply

 3      says, and I didn't draft the contract, but what

 4      the contract -- what I heard was a clause that

 5      says that if, on the assignment of the lease,

 6      there is a take-back of space, and that would

 7      be a condition that would terminate the

 8      contract.

 9                  THE COURT:  I tried to keep up

10      with Mr. Campo.  I don't want to beat a dead

11      horse.  But, I tried to keep up with Mr. Campo

12      when he was reading that to me by reading that

13      myself.  And, I think at best the language is

14      ambiguous.  But, I cannot for the life of me

15      understand how it can have the attributes you

16      attribute to it.

17                  MR. BACKENROTH:  "Any amendments

18      at least decreasing the tenant space and/or

19      increasing the rent as a result of the

20      transfer, shall be null and void unless --"

21                  THE COURT:  Oh, wait a second, as

22      a result of the transfer?

23                  MR. BACKENROTH:  That is what it

24      says.

25                  THE COURT:  Okay, I owe you an
```

```
 1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2      apology.

 3                  MR. BACKENROTH:  Page 13, so -- I

 4      am sorry.  So, the way I read it is that if the

 5      result, if there is a decrease as a result of

 6      the transfer, that is a type of clause that you

 7      see in some of the form leases, and perhaps

 8      negotiated leases, that say that if I assign it

 9      to someone else, the landlord can take back the

10      space at a certain amount --

11                  THE COURT:  Please accept my

12      apologies, Mr. Backenroth.  I see where you are

13      coming from and I don't have a problem with

14      what you're telling me.

15                  MR. BACKENROTH:  That is all it

16      does say.  That doesn't mean that at the end of

17      the day, if the landlord throws up enough

18      smoke, that he may cause Mr. Wolf to back out.

19      I think that we indicated in our papers or

20      perhaps not, that there was a serious claim

21      lodged against the landlord for tortious

22      interference.

23                  And much of the litigation and

24      legal fees that they are talking about is not

25      landlord/tenant type of, "I didn't pay the
```

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2    rent," an eviction.  It is proceedings in which
 3    we asked for permission from the landlord to
 4    assign it over on a $5 million deal that would
 5    have paid everybody off, including whatever it
 6    is that they would have been owed, and the
 7    Limelight landlord because it was a joint deal.
 8    And, we believe that they scootched that deal.
 9    And, they inhibited that deal, and they
10    tortiously interfered.  That was the cause of
11    much litigation in State Court.
12                This clause is simply a clause
13    that, as I said, a normal type of provision
14    that many landlords put in because they think
15    they can grab back space because of an
16    assignment.  I filed Chapter 11 solely to get
17    around provisions of this nature, although I
18    must submit that was not the reason for the
19    filing of this petition.
20                So, that clause will not fly, if
21    they are looking to inhibit the sale based upon
22    that, Your Honor.
23                THE COURT:  Okay.
24                MR. BACKENROTH:  Basically, as I
25    said, what is the downside?  Your Honor will
```

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    schedule a sale, for argument's sake, with

3    three-weeks' notice.  Either we are going to be

4    able to do that, or they will have returnable a

5    notice to terminate the lease.  That is all

6    that is going to happen.

7              So, against the prospects of

8    getting $1 million 3, plus their postpetition,

9    I don't think they are in a worse position

10   unless their objective is not as they say, so

11   we are in favor of the sale, if there is a real

12   sale.

13             Do they have good reasons to take

14   back the premises?  Perhaps they think they can

15   do better on what is probably a below market

16   rent leaseholders arrangement.

17             They want to point out things to

18   any prospective purchaser to try and spook the

19   sale?  I don't know if they will do that or not

20   do that.  But, the contract is there, and the

21   lease is there, whoever wants to make a bid on

22   it.

23             Either they will close based on

24   the assumption and assignment, or they won't

25   close.  And, that will be determined very

```
 1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT
 2      quickly.  And the, proof of the pudding is, is
 3      there going to be a sale, is there not going to
 4      be a sale, will Mr. Wolf go forward or not?
 5                  They put down a deposit.  That
 6      deposit was released as part of an
 7      understanding between the parties.  They do
 8      have $100,000 down.  My client tells me they
 9      are still prepared to go forward.  And,
10      therefore, I am asking the Court to schedule a
11      hearing.
12                  Three weeks from now, if it turns
13      out that they are not going forward, nobody
14      else comes forward, nobody else is prepared to
15      do it, they will get back their premises.  So,
16      what is the downside really at this point when
17      you weigh the various alternatives before the
18      Court?
19                  The prospect of the estate being
20      enhanced by what we believe is $700,000, and
21      the downside for the rent attributable to three
22      weeks or whatever it is Your Honor thinks is an
23      appropriate notice, that may be their downside.
24      Well, their upside is $1 million 3 plus, at
25      least, what they claim is legal fees.  We,
```

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    obviously, don't agree with that.

3                    I have been informed that our

4    legal fees on the other side of this

5    transaction were about $60,000.

6                    So, when somebody tells me half a

7    million dollars when we spent $60,000, I

8    suspect that --

9                    THE COURT:  Does that also

10   include legal fees associated with the tortious

11   interference claim?

12                   MR. BACKENROTH:  I am not one

13   hundred percent sure.  I won't represent that

14   to the Court.  But, my understanding is the

15   fees were $60,000.  It is possible that the

16   fees concerning tortious interference may have

17   been in addition to that.  That is possible,

18   but I don't think that is compensable under the

19   lease as well.  The landlord/tenant issue,

20   nonpayment of rent, perhaps.  And, if there is

21   a good reason for nonpayment of rent because

22   they frustrated our ability to sell and pay

23   them, that may be a defense to our legal fees

24   as well.

25