# ORIGINAL

FILED
.S. BANKRUPTCY COURT

2001 AUG 15  P 4: 25

S.D. OF N.Y.

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

In the Matter
of

H.C. ENTERTAINMENT CORP.,
                    Debtor,

       -and-

LANSDOWN ENTERTAINMENT CORP.,
                    Debtor.

Case Nos.
01-B-13591

01-B-13592

------------------------------------x

August 13, 2001

United States Custom House
One Bowling Green
New York, New York 10004


Adj. From: 07/10/01 (2); Hearing of Sale of
Assets; Adj. From: 07/18/01 (1); Motion by NYS
Liquor Autority to Lift Stay; Motion by Atty for
Waterfront NY to Compel Timely Performance of
Lease Obligations or Reject Lease; Adj. From:
07/10/01 (2); Hearing of Sale of Assets.


B E F O R E:

             HON. ROBERT E. GERBER,

                        Bankruptcy Judge.

2

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2

3    A P P E A R A N C E S :

4

5

6    BACKENROTH, FRANKEL & KRINSKY, LLP

7         Attorneys for Debtors

8         One Dag Hammarskjold Plaza

9         885 Second Avenue

10        New York, New York 10017

11

12    BY:    ABRAHAM BACKENROTH, ESQ., of Counsel

13

14

15

16    VICTOR & BERNSTEIN, P.C.

17        Attorneys for Flatiron

18        18 East 41st Street

19        New York, New York 10017

20

21    BY:    SAUL L. VICTOR, ESQ., of Counsel

22

23

24

25

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2

3    A P P E A R A N C E S (Continued) :

4

5

6            SCHWARTZ, LICHTENBERG, LLP

7                    Attorneys for Mansion Realty

8                    The Bar Building

9                    36 West 44th Street, Suite 1111

10                   New York, New York 10036

11

12           BY:    BARRY E. LICHTENBERG, ESQ.,

13                                    of Counsel

14

15

16

17           LeBOEUF, LAMB, GREENE & MacRAE, ESQS.

18                   Attorneys for Waterfront NY, LP

19                   125 West 55th Street

20                   New York, New York 10019

21

22           BY:    JOHN P. CAMPO, ESQ., of Counsel

23                          -and-

24           BY:    JAY G. SAFER, ESQ., of Counsel

25

4

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2

3    A P P E A R A N C E S (Continued) :

4

5

6            STEVEN I. HONIG, ESQ.

7                    General Counsel to Waterfront NY, LP

8                    224 12th Avenue

9                    New York, New York 10001

10

11           FINKEL GOLDSTEIN BERZOW ROSENBLOOM & NASH,

12           LLP

13                   Attorneys for Flatiron Entertainment

14                   Contract Vendee

15                   26 Broadway

16                   New York, New York 10004

17

18           BY:   NEAL M. ROSENBLOOM, ESQ., of Counsel

19

20           CAROLYN S. SCHWARTZ, ESQ.

21                   Office of the United States Trustee

22                   33 Whitehall Street

23                   New York, New York 10004

24

25           BY:   TRACY HOPE DAVIS, ESQ., of Counsel

DOYLE REPORTING INC. - 212-867-8220

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2

3   A P P E A R A N C E S (Continued) :

4

5            DAVID J. KENNEDY, ESQ.

6            U.S. Department of Justice

7            U.S. Attorney's Office

8            Southern District of New York

9                 Attorney for Internal Revenue

10                Service

11                100 Church Street, 19th Floor

12                New York, New York 10007

13

14

15

16           NEAL S. MANN, ESQ.

17           Assistant Attorney General

18           Office of Attorney General

19                Attorney for New York State Liquor

20                Authority

21                120 Broadway

22                New York, New York 10271-0221

23

24

25

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2

3     A P P E A R A N C E S (Continued) :

4

5          THE LAW FIRM OF ROBERT W. DREMLUK

6               Attorney for Lupoli Group

7               The Lincoln Building

8               60 East 42nd Street

9               New York, New York 10165

10

11     BY:   ROBERT W. DREMLUK, ESQ.

12

13

14   ALSO PRESENT:

15        KYLE MERKER, Chair, Community Board Five

16        AMIR BENESH

17        PETER LUPOLI

18        JEFF BRENNER, Director, Kurfew

19               Entertainment

20        HOWARD FUCHS

21        JEFFREY WAYNE LAMB, J. & C. Lamb Management

22               Corp.

23        HELENE BLUM

24

25

H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

P R O C E E D I N G S

1
2
3          THE COURT:  I want to apologize for
4   the delays.  The court reporter's agency, not the
5   court reporter, apparently had a misunderstanding
6   as to the time under which we can begin.  They
7   gave her the wrong instructions, and you all, like
8   me, were waiting to get underway.
9          With that said, let me get
10  appearances of those who know they will be
11  speaking today, and, then, I want to hear from
12  you, Mr. Backenroth, in the first instance, with
13  respect to setting forth how you believe the
14  agenda should proceed, and, then, aspects of the
15  rules under which we will then proceed,
16  thereafter.
17
18          First, for the Debtor --
19          MR. BACKENROTH:  Abraham Backenroth,
20  Backenroth, Frankel & Krinsky.
21          THE COURT:  Okay.
22          MR. LICHTENBERG:  Barry Lichtenberg,
23  Schwartz, Lichtenberg, for Mansion Realty, the
24  landlord in the Lansdown Entertainment bankruptcy.
25          THE COURT:  Okay, Mr. Lichtenberg.

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2                      MR. VICTOR:  Saul Victor, Victor &

3      Bernstein for the contract vendee, co-counsel.

4                      MR. ROSENBLOOM:  Good morning, Neal

5      Rosenbloom, Finkel Goldstein Berzow.  We are

6      bankruptcy counsel to Flatiron Entertainment, the

7      contract vendee in the Lansdown Entertainment

8      case.

9                      THE COURT:  Mr. Rosenbloom.

10                     MS. DAVIS:  Tracy Hope Davis for

11     Carolyn Schwartz, the U.S. Trustee.

12                     THE COURT:  Right.

13                     MR. CAMPO:  Good morning, Your Honor,

14     John Campo and Jay Safer from LeBoeuf, Lamb,

15     Greene & MacRae, on behalf of Waterfront New York,

16     LP for H.C. Entertainment.

17                     THE COURT:  Right.

18                     MR. HONIG:  Good morning, Steve

19     Honig, general counsel for Waterfront New York,

20     LP.

21                     THE COURT:  Okay.

22                     MR. KENNEDY:  Good morning, Your

23     Honor, David Kennedy, Assistant U.S. Attorney,

24     U.S. Attorney's Office for the IRS.

25                     MR. MANN:  Good morning, Your Honor,

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2   Neal Mann, Assistant Attorney General for New York

3   State Liquor Authority.

4              THE COURT:  Okay, anyone else at this

5   juncture?

6              (No response.)

7              THE COURT:  Fair enough.

8              Okay, Mr. Backenroth, we have several

9   matters on the agenda today.

10             MR. BACKENROTH:  Yes, Your Honor I

11  would like to deal with the sale concerning the

12  Limelight.

13             Basically, we have scheduled that for

14  a hearing today.  We have several bidders.  I

15  would like to lay out some of the procedures by

16  which I would like to proceed here.

17             There is a certain unique aspect for

18  bidding on this type of a situation.  It is not

19  enough that somebody just simply offers more

20  money.  We have to have at least some preliminary

21  understanding that the type of person that is

22  making the bid is someone that we believe, at

23  least comfortably, could pass SLA approval.

24  So, I have asked for Your Honor to come in.

25             And, also, there has been a bit of

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    delay, whether or not those people are interested

3    in bidding, to give us at least on the sheet what

4    other nightclubs they may have.

5            And I would ask those people a few

6    questions before they bid to find out whether or

7    not there are things like violations or any types

8    of proceedings that may have been pending or fines

9    against those nightclubs.  Because if there were,

10   that would go into the Debtors' thinking in terms

11   of the recommendation to the Court as to whether

12   or not we would accept that bid as the best and

13   highest offer because a bid for any amount of

14   money that will not pass the SLA is a useless

15   enterprise.

16           THE COURT:  You're pointing out that

17   the bid not only has to be highest, it also has to

18   be best?

19           MR. BACKENROTH:  That is correct.

20           So, what I would do, as I would lay

21   out the terms of the bidding, and I would, before

22   someone or if someone wishes to make a bid, I

23   would like to ask them a few questions, in order

24   to determine that we don't have these type of

25   problems.  And, if we do, then, I would have to

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    consult with my client as to whether or not they

3    feel that that is something serious enough that I

4    would recommend that we not accept that bid, or

5    that we take our chances with having them as a

6    bidder that may or may not pass SLA approval.

7              THE COURT:  Okay, rather than calling

8    everybody who has identified themselves so far in

9    terms of asking whether anybody has any objection,

10   I am just going to rely upon you all to speak up

11   if you have any problems with the approach that

12   Mr. Backenroth stated.

13             I don't hear any objection.

14             MR. LICHTENBERG:  There is just one

15   point, Judge.

16             THE COURT:  Yes.

17             MR. LICHTENBERG:  Barry Lichtenberg

18   from Mansion.

19             There seems to be two elements.  One

20   is how much should be bid.  And the second is the

21   manner in which the payments could be paid

22   pursuant to the bidding.

23             We would respectfully ask the Court

24   if biddings could start at a price consistent with

25   the amended Order scheduling a sale of assets and

12

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    the notice of intended sale.

3                Mansion Realty is owed as of now $1

4    million 950 --

5                THE COURT:  Say that slower.

6                MR. LICHTENBERG:  $1,959,000.

7                In fact, we have filed a proof of

8    claim which contains a schedule of the amounts

9    that are due.  The schedule is called "Schedule of

10   rent and charges due to Mansion Realty, LLC,

11   Lansdown Entertainment, Corp."  I would be glad to

12   hand up a courtesy copy to the Court at this

13   time --

14               THE COURT:  I would be grateful for

15   that, Mr. Lichtenberg.  Would you provide it to

16   one of my law clerks, please?  And your point, Mr.

17   Lichtenberg, is that these are cure amounts that

18   have to be satisfied incident to any assumed and

19   assigned lease, as part of any sale?

20               MR. LICHTENBERG:  Exactly, Your

21   Honor, and, in fact, notice of the intent of the

22   sale did say starting price from Flatiron was 1.2

23   million, but there was an additional amount of

24   approximately $1.8 million, as noted in the notice

25   of intended sale.  And, basically, there has been

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    an additional month that has lapsed.  It has gone

3    up to 1.9 and change.

4              This number, Judge, does not even

5    include the security deposit of about $500,000,

6    which is another issue, and we would hope that

7    would be paid at or before closing by the

8    successful bidder.

9              THE COURT:  By not counting, you mean

10   not that you pocketed the security deposit.  That

11   is as a credit against the rent.  But what you're

12   saying is that a new security deposit would have

13   to be put in its place?

14             MR. LICHTENBERG:  We would expect

15   that.  The lease, it does provide for a proper,

16   viable tenant.  We don't know who the successful

17   bidder is going to be, so in lieu of the process

18   of interviewing this tenant who is coming in, if

19   we got the money, we are satisfied that this is,

20   in fact, a viable tenant.

21             THE COURT:  Yes, go ahead, Mr.

22   Lichtenberg.

23             MR. LICHTENBERG:  But, for purposes

24   of the bidding today, Judge, I would ask that it

25   start at the $1.24 million plus the additional 1.9

H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

1    million which comes out, for a total of 3.3

2    million --

3           THE COURT:  Does anybody want to be

4    heard on the point Mr. Lichtenberg made?

5           MR. BACKENROTH:  Yes, Your Honor, let

6    me clarify the situation.  We have gotten an

7    analysis from the landlord as to the amount of the

8    default that has to be secured.  And although we

9    have some small amounts that we might differ on,

10   for the purposes of the hearing, we are prepared

11   to accept the figure of the $1,959,000 as the

12   amount of the defaults that would have to be

13   cured.

14          In addition, there is a provision in

15   the lease which provides that upon an assignment

16   to a new tenant, there has to be a new security

17   deposit posted.

18          While we could quibble concerning the

19   question of whether or not that provision could be

20   enforced, because on assignment of the lease, any

21   step-ups may not be enforceable, but the landlord

22   has told us that if the new prospective tenant is

23   prepared to post the security deposit as required

24   under the lease, that they will now get into the

1   H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2   question of whether or not the tenant is a viable

3   tenant, which is another issue that we might have

4   to get into if this is done on a non-consensual

5   basis.

6           So, that is what that $500,000

7   deposit is all about.

8           But putting that money on the side,

9   the amounts that would have to be bid in order to

10  beat the initial bid of Flatiron, which is the

11  landlord's bid would be 1 million 2, which is the

12  amount that is already on the table.  1 million

13  959 plus another $100,000, which is the approved

14  overbid that has to be made the next highest bid.

15          So, it would be -- approximately,

16  $3,259,000 would have to be the next opening bid

17  in order -- in order to beat the landlord's bid.

18  And that is putting aside the issue of the

19  security deposit.  I am not talking about the

20  security deposit.  That issue is on the table.

21          Any prospective purchaser will have

22  to be aware that there is a security deposit issue

23  at least.  I am not saying that it could not be

24  done either way, but the landlord has indicated to

25  us that if the security deposit is put up, they

1     H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2     will not question whether or not the tenant is a

3     viable tenant for the purposes of the assignment

4     of the leasehold interests under 365.

5              So, really that is where that all

6     plays out.

7              THE COURT:  What was the sum of the 1

8     million 959, 1.2 and 100,000 that you were just

9     making reference to?

10             MR. BACKENROTH:  3,259,000.

11             THE COURT:  3,259,000.

12             MR. BACKENROTH:  Yes, that is

13    3,159,000 plus another $100,000, which is they

14    must enter a bid, 100,000 at least higher than the

15    opening bid and that is the 3,259,000 that would

16    be the opening bid, aside from the issue of the

17    security deposit.  In other words, the money they

18    would be paying to us and what we would have to

19    cure the defaults --

20             THE COURT:  Okay, I subscribe to most

21    of what you and Mr. Lichtenberg said, Mr.

22    Backenroth.  It seems to me that if we are talking

23    about curing, they have to cure whatever the total

24    amount ultimately turns out to be.

25             I Heard you saying, Mr. Backenroth,

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2   that you have no material differences with what

3   Mr. Lichtenberg said.  If it turns out that there

4   was a computational error, which I guess, could go

5   either up or down, what is necessary to cure, if

6   Mr. Lichtenberg's client is not the winning

7   bidder, will be what it turns out to be.  We will

8   assume, for the sake of the discussion, that the

9   next bid will have to be 3,259,000 and that such

10  amount might have to be adjusted slightly higher

11  or lower to meet the exact arrears due to the

12  landlord as they may later be ascertained.

13            All right, Mr. Backenroth, do you

14  have any position with respect the order in which

15  any higher bids are entertained?

16            MR. BACKENROTH:  Other than the fact

17  that I previously indicated, I would like to have

18  an opportunity to when someone offers a bid, to

19  ask him a few questions so that I know that there

20  is no SLA problem involved.  Aside from that, I

21  don't have any particular order, Your Honor.

22            THE COURT:  Okay.  And, we are

23  talking about increments of 100,000 as we go

24  forward?

25            MR. BACKENROTH:  That is correct,

1         H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    Your Honor.

3              THE COURT:  Yes, Mr. Victor.

4              MR. VICTOR:  Yes, thank you, Your

5    Honor.

6              THE COURT:  Mr. Victor, you and let

7    me ask everybody, those mikes will come as close

8    to you as you care to bring them, and you can even

9    raise them up and, especially, with so many people

10   in the courtroom, I would be grateful if you would

11   try to speak into them.

12             MR. VICTOR:  Certainly, Your Honor.

13   I think one other thing should be pointed out,

14   with respect to bidders and to the Court, and that

15   is there is a 30-day prefiling requirement with

16   the Community Board, contained in the Alcohol

17   Beverage Control Law.

18             And, the contract vendee, to the best

19   of our knowledge, is the only person who has

20   prefiled that notice and filed the application

21   with the State Liquor Authority, both for a

22   regular license and for the temporary retail

23   permit.

24             What that means is that any other

25   bidder would have to pay additional rent for the

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    at least one month waiting period that it takes

3    them to file with the Community Board, and, then,

4    file the application.

5                 So, that would be in addition to the

6    3,259,000 obligation of the purchaser.

7                 THE COURT:  Okay, you are saying that

8    it's not a show stopper from the perspective of me

9    conducting an auction today, but you are saying

10   that the Community Board's needs and concerns in

11   that regard have to be satisfied?

12                MR. VICTOR:  Yes, and that is the

13   requirement.  It's a 30-day notice.  I believe it

14   is Section 64, perhaps (a) or (c) of the Code.

15                THE COURT:  All right, does anybody

16   want to be heard with respect to what Mr. Victor

17   just said?

18                MR. BACKENROTH:  Well, Your Honor, I

19   think what it means as a practical matter is that

20   there may be another $60,000 that may have to --

21                MR. ROSENBLOOM:  $80,000 to the --

22                MR. LICHTENBERG:  Well, come down to

23   the rent --

24                MR. BACKENROTH:  Right, in other

25   words, $80,000 is the monthly rent, one of the

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    things that a prospective bidder may have to come

3    up with is additional money to cover the rent for

4    the period of time that he is negotiating.

5         THE COURT:  All right, what I draw

6    from this is, in essence, a first cousin of what

7    was stated a minute ago.  Whatever it takes to

8    cure the landlord's defaults, is going to be

9    whatever it takes.  And, we are going to use these

10   numbers as a rule of thumb, okay.

11        All right, the opening bid, if it's

12   to satisfy the earlier Order of this Court must be

13   in an amount equal to or greater than $3,259,000.

14   Is there anybody in the courtroom who would like

15   to make a bid at that level?

16        Please come up to the microphone, and

17   if you could come up to the lectern so everybody

18   can hear you, that would be great.

19        MR. LAMB:  My name is Jeff Lamb.  I

20   am one of the members of the New York Restaurant

21   and Entertainment, LLC.

22        MR. BENESH:  I am Amir Benesh, member

23   of New York Restaurant & Entertainment, LLC.

24        MR. LAMB:  Between us we have about

25   14 restaurants, and the way we had cast this offer

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    was to do a million and a half to the creditors,

3    and to satisfy the original -- what was listed as

4    the original debt for the landlord, which was 1

5    million 8.

6             THE COURT:  Well, the landlord amount

7    has now been announced to be 1,959,000, plus

8    whatever other rent has to be paid to satisfy the

9    landlord while the Community Board engages in its

10   review.

11            Can your bid be construed, for the

12   purpose of this discussion, as being $300,000

13   higher than the earlier bid of 1.2, plus paying

14   whatever it takes to pay the landlord's rent to

15   cure?

16            MR. LAMB:  The original number was --

17   I am not sure I am following all the arithmetic

18   that you just mentioned, but we were prepared at a

19   number of 3 million 3, which is about $40,000 over

20   the number that was previously mentioned of

21   3,259,000.

22            Our offer is predicated on SLA

23   approval.  And we understand now that there may be

24   this period of time that there may be an

25   obligation to pay rent.

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2                  THE COURT:  Mr. Backenroth, do you

3       want to be heard about that offer, both in terms

4       of its size and on the condition of the SLA

5       approval?

6                  MR. BACKENROTH:  Well, Your Honor, it

7       is subject to SLA approval.  Nothing gets

8       transferred without SLA approval, so that is a

9       given.

10                 THE COURT:  Okay.

11                 MR. BACKENROTH:  But, the prospective

12      bidder is going to have to assume the

13      responsibility or the risks, shall we put it that

14      way, and that there may be a period of time,

15      whether a month or two months, where it might be

16      required to get the SLA approval.  And, for that

17      reason, you will have to, in addition to the bid,

18      to cover those -- those accruals, as the landlord

19      is sitting without getting paid.

20                 I mean, in essence, that is his --

21      his bid.  It is his bid that is the amount that is

22      on the table plus if it takes 30 or 60 days, he is

23      eating that.  So, they have to be in a position to

24      match that.

25                 MR. LAMB:  Your Honor, we were told

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2   that there is a provision for an interim license

3   or a temporary license that can be gotten during

4   this period, preceding a permanent license.  And

5   we would want to know if we would be permitted to

6   operate, if the landlord would be permitted to use

7   the facility to operate during that time.

8               MR. BACKENROTH:  Right now, at least,

9   the decision that was made by the Debtor was not

10  to go for the temporary, but to go for the

11  permanent license, as a concern that that process

12  may derail the ultimate transfer of the license

13  and the successful conclusion of this case.

14              So, at least the business decision

15  has been made on this side of the table not to go

16  with the temporary license, even though it may

17  mean that there may be have a 30-day delay, there

18  may be a 30-day delay involved.

19              THE COURT:  Mr. Victor.

20              MR. BACKENROTH:  You should be aware

21  of that.

22              THE COURT:  Mr. Victor, did you also

23  want to be heard?

24              MR. VICTOR:  Yes, I did, thank you.

25              I think there has been a

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    misunderstanding.  Any applicant who wants to file

3    an application must send a 30-day prior notice to

4    the Community Board.  The contract vendee has done

5    that.  These gentlemen or some other party, the

6    successful bidder, they would first have to send

7    that 30-day notice before they could even file

8    one document with the State Liquor Authority.

9                Then the State Liquor Authority takes

10   anywhere from 60 to 90 days to investigate on that

11   application.  So, we are really talking about

12   anywhere from a three to four-month spread, from

13   the date of the filing of that notice with the

14   Community Board.  That notice could have been

15   filed by any bidder, and with or without a

16   contract, with the Community Board.  No one has

17   stepped forward to do that.

18                You are not required to have a

19   written contract or written agreement in order to

20   file that notice.  That is why we stepped up and

21   did that.  Thank you.

22                THE COURT:  All right.

23                MR. VICTOR:  I think that weighs in

24   on, not merely on the highest bid, but best bid.

25                THE COURT:  Well --

25

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    　　　　MR. LICHTENBERG:  Your Honor, if I

3    could just make one --

4    　　　　THE COURT:  Yes, Mr. Lichtenberg.

5    　　　　MR. LICHTENBERG:  Thank you.

6    　　　　There are three additional aspects

7    that I guess we have touched on.  I just want to

8    get a clarification so that the bidders are aware

9    of that as well.  Number one, as Mr. Backenroth

10   indicated, is a payment of rent for the interim

11   payment, however long that may be.  And we are

12   talking in the nature of between 80 and $100,000

13   per month.

14   　　　　The second is that at closing --

15   first of all, the notice of intended sale not to

16   mention 365 does contemplate a prompt closing and

17   the payment of all arrears.

18   　　　　Now, because of the SLA issues

19   involved here and the getting of the license, it

20   may take -- it appears unlikely that they will be

21   able to close by August 20th as provided for in

22   the notice of the sale.

23   　　　　Notwithstanding that, we need a firm

24   commitment that at closing, the landlord will be

25   paid in full, as opposed to under some terms.

H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

1

2      And, finally, we would need some

3  agreement from the bidder, this bidder or whoever

4  the successful bidder is, that at closing, they

5  will honor the obligation to remit an additional

6  sum of five-months security in the amount of

7  approximately $500,000.

8      THE COURT:  Okay, Mr. Backenroth, to

9  what extent, if any, do you agree or disagree with

10  what Mr. Lichtenberg just said?

11      MR. BACKENROTH:  Well, I agree

12  certainly with the first part, that if the process

13  may take 30, 60 or 90 days, to the extent that the

14  landlord must be secured then, if they are only

15  bidding a fixed sum, and not taking that into

16  consideration, then, in essence, the landlord is

17  bidding more because the landlord is bidding what

18  is due today, plus he will eat what is due between

19  now and the 90-day period.

20      So --

21      THE COURT:  Albeit that the landlord

22  may be in a position to close earlier than the

23  competitors.

24      MR. BACKENROTH:  It may very well be.

25  But, that is something that they did, I guess,

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2     with knowledge of how the SLA works and what you

3     have to do.  And they may have that advantage only

4     because they filed that piece of paper.  But,

5     whoever bids is going to have to cure the

6     landlord's obligations and pay money to the

7     estate.  And, if the monies that are paid to the

8     landlord will increase, and the amount is fixed,

9     they will, in essence, decrease the amount of the

10    money being paid to the estate.

11              THE COURT:  Okay.

12              MR. BACKENROTH:  So they have to

13    assume that responsibility.

14              THE COURT:  All right, but by

15    bringing this auction before me, you have

16    explicitly or implicitly brought yourself within

17    my jurisdiction to rule on what I consider to be

18    appropriate rules of bidding.  They are as

19    follows:

20              That the opening bid, subject only to

21    minor adjustments for the exact computations,

22    does, indeed, require cure of the amounts to the

23    landlord, which based on all facts now known to

24    us, are $1,959,000, but subject to adjustment.

25              The rules also require $100,000 for

H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

1  bid increments, and the initial bid was 1.2

2  million over the amount to cure to the landlord.

3           Putting it another way, and I think

4  the better way, is that each bid should be

5  regarded as the amount necessary to cure to the

6  landlord at such time as closing takes place, plus

7  an increment or an amount for the Debtor, and,

8  ultimately, that means, of course, the Debtors'

9  creditors.  And for those of you who are not

10  lawyers here, what I am talking about is money

11  that goes to creditors first before it goes to the

12  equity of the Debtor.

13           The next bid, originally had the

14  sound of being 300,000 better for the estate.  But

15  if I am to regard it as such, it has to be 300,000

16  above the amount necessary to cure defaults to the

17  landlord.

18           If, as is likely, known from facts

19  that we are not stating, some or all of that

20  apparent $300,000 increment will need to go to the

21  landlord, then we need to value the amount of the

22  increment that is left for the estate and

23  ascertain whether it's $100,000 better, and/or

24  give the bidders an opportunity to increase their

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2   bid so that it's, in fact, $100,000 more or better

3   for the creditors.  That is my ruling in terms of

4   the ground rules.

5           So, with that said, Mr. Lamb, I would

6   give you a moment to caucus with your colleague,

7   if you wish, to see whether you are prepared to

8   make a bid under those guidelines.

9           MR. LAMB:  What I would like to do is

10  just caucus outside, is that all right?

11          THE COURT:  We will take a few

12  minutes.  But, Mr. Victor --

13          MR. VICTOR:  I think there is one

14  other point in the Order for sale or the

15  conditions.  It requires the purchaser to close by

16  August 20, 2001, within ten days after Bankruptcy

17  Court approval, time of the essence, subject to

18  reasonable extensions, but in no event can the

19  closing be extended beyond August 20, 2001.

20          I suggest to the Court that there is

21  no possible way for these people to get a license

22  by August 20th.  They have not even filed the

23  required 30-day notice.

24          THE COURT:  Today is August 13th.

25  Are you saying that you are the only bidder who

1     H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2     can satisfy that condition, Mr. Victor?

3          MR. VICTOR:  I am, Your Honor,

4     because no one else, to my knowledge, has filed

5     the pre-notice to the Community Board.

6          MR. BACKENROTH:  Your Honor, then I

7     would state on the record that since the Debtor

8     has the right to give reasonable extensions, we

9     will give reasonable extensions beyond that date

10    because the essence of the sale is it's a closing

11    subject to SLA approval.

12          While we do have some dates over

13    here, the date was so that people understood one

14    must move very expeditiously because of the

15    proceedings, but it was not intended that there

16    should be only one bidder.

17          If these people are going to do what

18    they have to do, and they are an acceptable

19    bidder -- we are talking about an all cash

20    proposal.

21          MR. LAMB:  It didn't say all cash.

22    This is predicated on terms, but this --

23          MR. BACKENROTH:  Is your proposal

24    based on all cash?

25          MR. LAMB:  It is not 100 percent

H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

1

cash, no, sir, it is not.

2

        MR. BACKENROTH:  Well, could you

3

state --

4

        THE COURT:  I think you are entitled

5

to probe as to the exact nature of the terms that

6

are proposed.

7

        MR. BACKENROTH:  What, the landlord,

8

has to be paid in full.  Put that aside.

9

        Now, what is the amount that you are

10

bidding for, let us say, for creditors, and how is

11

it going to be paid?

12

        THE COURT:  Wait, gentlemen, in my

13

courtroom, everybody gets a chance to be heard

14

eventually, but nobody gets a chance to be heard

15

talking over the other guy.  Let Mr. Backenroth

16

finish his question, and, then, you will get your

17

chance, Mr. Lamb.

18

        MR. BACKENROTH:  In other words, the

19

amounts that you have to cure for the landlord,

20

that you have to cure the landlord.  Let's focus

21

on what is going to be paid to the creditors.

22

What is the amount that you are prepared to bid on

23

that and how is it paid?

24

        MR. LAMB:  Our original position was

25

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2      one and a half million dollars to the creditors,

3      150,000 at closing, $20,000 for the first month --

4      for the first 16 months, $50,000 per month for the

5      next 20, and 30,000 for the last month.

6                  MR. BACKENROTH:  Your Honor, the

7      opening bid of the landlord, I believe, is

8      $300,000 to begin with.  And I think that I would

9      not accept those kind of terms.  I understood

10     originally speaking to these gentlemen that they

11     were talking about an all cash proposal.  But if

12     they are talking about like $150,000 down, I don't

13     think that that is what we would be thinking

14     about.

15                 THE COURT:  All right, again, Mr.

16     Lamb, do you want to be heard?

17                 MR. LAMB:  We can reconsider that

18     position.  I never mentioned our offer was 100

19     percent all cash.  But I can caucus with my

20     partner, my associate, and we can reconsider that.

21                 THE COURT:  All right.  What we are

22     going to do here is within limits and reason, we

23     are going to allow people to do the thinking and

24     discussion they need to maximize the benefits for

25     everybody.  But let me make the ground rules

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    clear.  I have already advised you that any bid in

3    order to be regarded as satisfactory and to be

4    superior to the one that is already on the table,

5    must pay any and all amounts legitimately due to

6    the landlord at closing or -- and I have a little

7    bit of authority here, a few days, not weeks, not

8    months, but a few days thereafter.

9            The bid can be no worse in its terms

10   of payment, and by "terms," I mean timing and

11   quality of financial assurances, than the 1.2 for

12   the creditors that is already on the table.

13           Mr. Backenroth, would you please

14   refresh my recollection as to what the timing

15   terms are of the proposal now on the table with

16   respect to their timing and the quality of credit

17   for payment?

18           MR. BACKENROTH:  Yes, $300,000, the

19   cash portion of it.  Then, there are 48 equal

20   monthly payments of $18,750.  That is what --

21           THE COURT:  On a monthly basis?

22           MR. BACKENROTH:  Yes, Your Honor.

23           THE COURT:  Any security to the

24   estate, associated with the payment --

25           MR. BACKENROTH:  Yes, there are

34

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    notes, and the lease is taken back as security for

3    the transaction, and all the other assets.

4                THE COURT:  In other words, the

5    seller retains kind of like a purchase money

6    security interest in the remainder to secure the

7    48 payments at 18 thousand plus --

8                MR. BACKENROTH:  That is correct.

9                THE COURT:  Okay, Mr. Victor.

10               MR. VICTOR:  Your Honor, I would like

11   to clarify because I don't think Mr. Backenroth is

12   that familiar with the provisions.  I negotiated

13   them with Stroock, Stroock and Lavan.  The balance

14   of the purchase price is secured by a purchase

15   money security agreement.  The lease is not --

16   does not stand as collateral for the unpaid

17   balance of the notes.  But I would point out that

18   the largest single member of the purchasing entity

19   is the owner, his wife --

20               THE COURT:  What is the security

21   under the purchase money security agreement?

22               MR. VICTOR:  A purchase money

23   security agreement.

24               THE COURT:  Yes, I understand.  If

25   you are talking about security agreements, it has

35

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2   collateral, what is the collateral?

3               MR. ROSENBLOOM:  Physical assets.

4               MR. VICTOR:  All of the trade

5   fixtures, equipment inventory, the right for the

6   use of the name.  It does not include the lease.

7               THE COURT:  All right, Mr. Lamb,

8   would you like a few minutes to caucus?

9               MR. LAMB:  Yes, I would.  I do have

10  one question.  Are we the only other bidder, with

11  the exception of the landlord?

12              THE COURT:  We will know as the

13  morning progresses.

14              MR. LAMB:  Okay, thank you.

15              THE COURT:  On the one hand, I want

16  the bidding to have the ability to proceed.  On

17  the other hand, I am not going to sit here while

18  people caucus.  Any of you can call me back into

19  the courtroom as soon as these people are back or

20  at such a time as you feel you want to proceed

21  with going any further.  Please let them know

22  before anybody starts getting up.

23              Mr. Backenroth, please let Mr. Lamb

24  know what I just said.

25              MR. BACKENROTH:  No problem.

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2                THE COURT:  We are adjourned until

3    somebody calls me back in.

4                (Recess taken.)

5                THE COURT:  Please be seated.  Where

6    are we first?

7                Does Mr. Lamb have anything further

8    to report?

9                MR. LAMB:  Yes.

10                Your Honor, we have had a chance to

11   talk between my associate and myself, and we

12   understand the ground rules that you have put

13   forward here.  We can't make an offer exactly to

14   the words of your ground rules.  We want to make

15   this offer.  If it's accepted, great, if it's not

16   accepted, that is fine.  It is in light of

17   difficulties with the Community Board.  We feel

18   that our concept as a restaurant / entertainment

19   center is more compatible with the Community

20   Board.  We know there is no mention of that in the

21   Purchase Order.

22                THE COURT:  You are speaking real

23   fast, say that again, say that again, your

24   concerns for the community.

25                MR. LAMB:  Our offer is based upon

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2   having a restaurant and entertainment center as

3   opposed to just a straight nightclub.  The

4   Community Board has made -- put forward a lot of

5   objections to just having a club at that location.

6   Our offer is based on having something that is in

7   harmony with the community.

8              Along those lines, I just want to

9   tell you what our offer is.  It is 150,000 --

10   1,500,000 to the creditors.  150,000 at closing.

11   $20,000 per month for the first 16 months.

12   $50,000 per month for the next 20 months --

13              THE COURT:  Forgive me, Mr. Lamb,

14   could you say that slower?

15              MR. LAMB:  I am sorry, 1,500,000.

16              THE COURT:  To the creditors in the

17   form of --

18              MR. LAMB:  In the form of cash.

19   150,000 at closing.

20              THE COURT:  Okay.

21              MR. LAMB:  The closing would be at

22   such time as we are able to get the permanent

23   authorization from the State Liquor Authority, and

24   any other agencies having jurisdiction over this

25   premises.

38

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2               The next payment would be $20,000 per

3   month for the first 16 months.  Then $50,000 per

4   month for the next 20 months.  30,000 the last

5   month.  And that should fully amortize the $1.5

6   million.

7               THE COURT:  Okay.

8               Mr. Backenroth, do you have any

9   questions on that proposal?

10              MR. BACKENROTH:  Yes, what about the

11  landlord?

12              MR. LAMB:  The landlord, since there

13  were a number of numbers mentioned with the

14  landlord, and it seems as if there are

15  contingencies as to how long the process would

16  take going through the State Liquor Authority, a

17  number of 30 to -- I am sorry, a number of three

18  months to perhaps five months, perhaps six months,

19  whatever it takes, is what we would offer to the

20  landlord at closing, whenever that is, pay him

21  half a million dollars in cash.  And, whatever the

22  total amount due and owing to the landlord is at

23  that moment in time, we would amortize that

24  amount, which is estimated to be something over $2

25  million, amortize over that.  We would amortize

1     H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2     that over the next 24 months.

3          MR. BACKENROTH:  That is the problem.

4     That is the reason why I asked the question.  The

5     landlord, I assume, will insist upon, that his

6     defaults are cured at the closing.  And they are

7     offering only to pay a half a million dollars of

8     the approximately million 9 to $2 million that is

9     owed.  And there will be more than that owed.

10         So, I don't know if that is as good a

11    proposal as the landlord's one that he had on the

12    table.  In fact, I would recommend the landlord's

13    proposal is better than that.

14         THE COURT:  I would love to hear a

15    proposal that has the support of the community and

16    at least not opposed by the community.  But the

17    issues that are before me require me to consider

18    rights under Bankruptcy Law.  Under the Code, the

19    landlord has a right to prompt cure.  Although

20    people can debate what is prompt cure, I don't

21    think anybody can seriously contend that

22    amortizing over 24 months satisfies that

23    requirement unless the landlord is prepared to

24    waive it.

25         Mr. Rosenbloom or Mr. Lichtenberg, do

1          H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    you want to respond to that?

3               MR. LICHTENBERG:  On behalf of the

4    landlord, let me firmly state that we are not

5    prepared to waive the obligation of the bidder to

6    prompt a cure in the arrears, which are $1.9

7    million.  And we are not going to accept a payout

8    over two years, Your Honor.  It is not even close

9    in our perspective.

10              THE COURT:  Okay, subject to

11   anybody's rights to be heard, I have to rule that

12   as much as I would love to find something that is

13   consistent with the Bankruptcy Code and meets the

14   needs and concerns of the community, I can't

15   rewrite the Bankruptcy Code, and I can't make the

16   obligation of prompt cure go away.  Unless that

17   bid is revised, I have to regard it as not capable

18   of being considered by the Debtor.

19              MR. LAMB:  Your Honor, we can't

20   revise that position right at this particular

21   juncture, at this moment in time.

22              THE COURT:  I understand.

23              MR. BENESH:  Regarding the temporary

24   license, we will consider our numbers based on

25   Your Honor's decision regarding the temporary

41

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2   liquor license.  If we are going to assume and

3   operate immediately according to the law, we can

4   assume the liquor license and operate it on a

5   temporary liquor license immediately, our number

6   can go up and we can revise this offer.

7            THE COURT:  Well, I am pleased to

8   hear that.  But if there is any misunderstanding,

9   let everybody in the courtroom understand what my

10  rule is.  My rule is not to negotiate with any

11  party.  My rule is first and foremost to enforce

12  the Bankruptcy Code.  And within those confines to

13  insure that I have a fair process going on, and

14  that I am taking reasonable steps to maximize the

15  recovery for creditors.

16            If you folks want to talk among

17  yourselves, if you do it real quietly, I will even

18  let you keep talking while you stay in the

19  courtroom, albeit not where you are standing now.

20  But given that, I am going to ask that the auction

21  go forward.  I -- yes, sir, Mr. Victor?

22            MR. VICTOR:  One clarification, I

23  would like to know whether or not these bidders

24  have a 10 - percent certified check as the Order

25  requires or is it available today?

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2            THE COURT:  You are entitled to an

3    answer today.

4            MR. LAMB:  We can get a check later

5    today.  We don't have the check with us because of

6    the way the notice of sale was written.

7            MR. VICTOR:  I think it is very

8    clear.  It says a certified check, 10 percent of

9    all bidders, other than the contract vendee.  He

10   said he can get a check.  I still didn't hear a

11   certified check.

12           MR. LAMB:  Certified.

13           MR. BACKENROTH:  What would be the

14   amount of the certified check?

15           MR. LAMB:  It would be 10 percent.

16           THE COURT:  Of --

17           MR. LAMB:  We had originally planned

18   10 percent of the offer to the creditors.  So, we

19   can get a check for $150,000 today, certified

20   funds.

21           MR. BACKENROTH:  I understood, Your

22   Honor --

23           THE COURT:  All right, Mr.

24   Backenroth, would you like to be heard with

25   respect to how we proceed next?

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2                   MR. BACKENROTH:   I would ask whether

3       or not there are any other bidders in this

4       courtroom who wish to make a higher bid and,

5       maybe, we can just clarify again, we are talking

6       about satisfying all the landlord obligations and

7       some may accrue afterwards, plus at least a

8       million 2, plus the bidding amount, the topping

9       amount, which is another $100,000, so if you want

10      to state it another way, it is 1,300,000, and what

11      is necessary to cure the landlord.  The landlord

12      is owed 1,950,000 approximately, plus whatever

13      amount of time there may be in order to close on

14      this thing, and that runs at approximately $80,000

15      a month.

16                  Is there anybody else who wishes to

17      make a bid at this time with regard to the

18      Limelight?

19                  (No response.)

20                  THE COURT:   The record reflects

21      silence, Mr. Backenroth.

22                  MR. BACKENROTH:   I think that I

23      would, therefore, ask that the Court approve the

24      Flatiron contract.

25                  THE COURT:   Does anybody want to be

44

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2   heard further on that issue?

3               (No response.)

4               THE COURT:  The record will reflect

5   silence.

6               The papers reflect, unless they are

7   controverted in any way, an appropriate exercise

8   by the Debtor of its business judgment on the

9   sale.  And reasonable, albeit not ultimately

10  successful efforts to try to maximize value by an

11  auction here.

12              Does anybody have any further desire

13  to be heard in any way, shape or form before I

14  rule on the Debtors' application for approval of

15  the Flatiron purchase?

16              MR. KENNEDY:  David Kennedy from the

17  U.S. Attorney's office.

18              THE COURT:  Yes, Mr. Kennedy.

19              MR. KENNEDY:  Two minor clerical A.M.

20  emendations it is to the Order.  I don't know if

21  Your Honor wants to hear them now.

22              THE COURT:  Well, forgive me, Mr.

23  Kennedy, but let's take it one step at time.

24  Before we talk about the form of the Order, let's

25  determine whether I will grant any Order.

```
 1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2              MR. KENNEDY:  Absolutely, Your Honor.

 3              THE COURT:  Okay, anybody want to be

 4      heard further?

 5              (No response.)

 6              THE COURT:  Okay, no material

 7      disputed issues of fact having been presented to

 8      me, requiring a need for an evidentiary hearing I

 9      find based upon the showings made in the motion,

10      plus my taking judicial notice of what I have seen

11      in this courtroom today, that the Debtor has taken

12      appropriate steps to try to maximize the value,

13      and has complied with the concerns of the

14      Bankruptcy Code with respect to the sale.

15              Needless to say, I do not, and I

16      cannot rule on any concerns by the community and

17      other people, except to the extent that they raise

18      matters of Bankruptcy Law.

19              The record will also reflect that the

20      Debtor tried, but ultimately did not succeed, to

21      obtain a bid that would be satisfactory to the

22      community members, who while they don't have the

23      status as creditors, the Debtor would certainly be

24      entitled to, as would the Court, consider their

25      views, if possible.
```

46

 1     H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2              With that said, the motion is granted

 3     in that, and I'll not now hear discussions with

 4     respect to the form of the Order.

 5              Mr. Kennedy, I think it is now a fair

 6     time for you to be heard.

 7              MR. KENNEDY:  Thank you, Your Honor.

 8     I appreciate your continued indulgence in that.

 9              The only -- well, there are actually

10     two emendations now that I look at the Order here.

11     The more important one is that the liens, claims

12     and encumbrances should attach to the proceeds of

13     the sale.  And, this phrase was dropped from the

14     amended Order scheduling a sale of the assets, no

15     doubt due to an oversight in the same order and

16     priority as they attached to the underlying

17     assets.

18              THE COURT:  Mr. Backenroth?

19              MR. BACKENROTH:  I will add, in fact,

20     I will circulate the Order to make sure everybody

21     is satisfied with the language, so that we don't

22     have an issue concerning that.

23              But, obviously, it is in the order of

24     priority, which exists in terms of leading claims.

25              THE COURT:  Okay, Mr. Kennedy.

1          H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2                    MR. KENNEDY:  Secondly, it has

3      actually just struck me that the caption says this

4      is in the Eastern District of New York.  We simply

5      suggest it reflect the Southern District of New

6      York.

7                    THE COURT:  I will certainly concur

8      with that.

9                    Mr. Backenroth?

10                   MR. BACKENROTH:  Yes, we agree with

11     that.

12                   THE COURT:  Okay, does that take care

13     of our business on the Limelight?

14                   MR. BACKENROTH:  Your Honor, it

15     depends on if Your Honor wants to hear the

16     question on the lift stay motion together at the

17     end, or you want to hear it for each one

18     separately.  It is the same argument.

19                   THE COURT:  Yes, I would like to

20     consider the lift stay once, and unless there is

21     an argument that different factors apply to the

22     two properties, I will consider that together.

23                   If you are okay with that, Mr.

24     Mann --

25                   MR. MANN:  I am, Your Honor.


                  DOYLE REPORTING INC. - 212-867-8220

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2              THE COURT:  All right, I want to turn

3    to where we stand on The Tunnel next.  But if

4    there is anybody in the courtroom who cares only

5    about the Limelight and not The Tunnel, you may

6    leave but you need not leave.  It is up to you

7    folks.  If you do leave, I simply ask that you

8    leave quietly and quickly.

9              All right, Mr. Backenroth, let's give

10   people a second to depart if they have a mind to.

11             (Off the record.)

12             Okay, Mr. Backenroth, proceed with

13   The Tunnel, please.

14             MR. BACKENROTH:  Yes, Your Honor.

15             THE COURT:  And make your

16   presentation as you see fit, but you can get a

17   running start if you give me some affirmative

18   attention to the needs and concerns voiced by Mr.

19   Campo and his firm.

20             MR. BACKENROTH:  I understand, Your

21   Honor.

22             Your Honor, we had noticed a sale of

23   The Tunnel as well as it being subject to better

24   and higher offers.  That was based upon the

25   original proposal of the Wolf Group.  They are not

49

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    prepared to go forward with the sale.  They wanted

3    some modifications in the lease.  The landlord was

4    not prepared to do that.

5             Instead, however, we do have what we

6    would call a responsible party, and we are

7    prepared to bring on an Order to Show cause on

8    very quick notice to put that party in.  They will

9    put up $200,000, which is necessary to cover the

10   defaults under the lease in the Chapter 11.

11            They will also put another --

12            THE COURT:  Let me interrupt you, Mr.

13   Backenroth.  You are talking about a prompt cure

14   of postpetition defaults?

15            MR. BACKENROTH:  That is correct,

16   that is what we are talking about.

17            THE COURT:  What about prepetition?

18            MR. BACKENROTH:  Prepetition, we

19   would not assume the lease at this time.  We are

20   not required necessarily to assume the lease at

21   this time.

22            We will bring them current in the

23   Chapter 11.  And we would use the leasehold

24   interest, which is an asset of this estate,

25   whereby we would get an overage of $40,000 a

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    month, for the next 20 or 22 months, which is the

3    term of the lease and generate approximately

4    $800,000 for the benefit of the estate and

5    creditors.

6                    I think on the --

7                    THE COURT:  Which I take it will be

8    largely the landlord on its prepetition claim,

9    won't it --

10                   MR. BACKENROTH:  There are also tax

11   claims as well involved.  There are other

12   creditors.  I don't think that they are the only

13   creditor.  And it would, basically, as far as we

14   are concerned, the best way at this moment to

15   maximize the recovery for creditors is the

16   insurance would be put in place in accordance with

17   the leasehold interests.

18                   They would be -- would stipulate that

19   they would not, they could not operate unless they

20   have insurance, which is the 1 million, 3 million,

21   and the no-exclusion for assault and battery, and

22   we have a party that is prepared to do that.  And

23   I am prepared to bring on a very short notice,

24   Order to Show Cause to approve them.

25                   THE COURT:  So, in essence, what

    1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

    2   today is, is a status report because you are not

    3   in a position to bring a 363/365 motion before me

    4   today?

    5              MR. BACKENROTH:  That is correct.

    6              THE COURT:  All right, because it's

    7   status, rather than asking for anything, because

    8   there is nothing for me to rule upon, but I

    9   certainly want to give you a chance, Mr. Campo, to

   10   be heard.

   11              And, no doubt you will mention, at

   12   least in passing, that if your expectation as to

   13   the buyer disappearance turns out to be true, and

   14   that you had been putting us on notice from day

   15   one that the landlord wasn't of a mind to rewrite

   16   its lease and to extend it beyond the present

   17   expiration --

   18              MR. CAMPO:  That is correct, Your

   19   Honor.

   20              THE COURT:  Do you want to say

   21   anything further?

   22              MR. CAMPO:  I have a lot to say.

   23              THE COURT:  Sure, do you want to come

   24   up to the lectern?  We have a crowded courtroom.

   25   We want everybody to be able to hear you.

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2               MS. DAVIS:   Your Honor, before Mr.

3       Campo is heard, very briefly, the U.S. Trustee has

4       concerns about Mr. Backenroth's statement, and the

5       Debtor wishes to oppose the appointment of a

6       responsible officer.   We would reserve our rights

7       under Section 1104 of the Bankruptcy Code to

8       object to the appointment of that type of officer.

9               THE COURT:   Sure.   I thought that

10      that was an issue that we were going to have to

11      deal with.   And I guess my thought is simply that

12      we are not going to deal with it today.   And I am

13      going to give you a better opportunity to

14      crystallize your thoughts and present them, Ms.

15      Davis.

16              MS. DAVIS:   Thank you, Your Honor.

17              THE COURT:   For Mr. Backenroth, do

18      the same and for Mr. Campo or anybody else who

19      wants to be heard on the subject, get in papers

20      and/or be heard otherwise on such a request at

21      such time as it is made.

22              But that is fine, especially since

23      there is nothing before me today.   Everybody's

24      rights are reserved in that regard.

25              MS. DAVIS:   Thank you, Your Honor.

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2                   THE COURT:  And I will leave it at

3      that and give Mr. Campo a chance to be heard now.

4                   MR. CAMPO:  Thank you, Your Honor.

5                   Your Honor, the one thing I really

6      hate to do, as I stand up at this lectern, is to

7      say, we told you so, but we told you so.  It is

8      quite obvious, Your Honor, that the Wolf deal was

9      never a real deal.  This Debtor came in here and

10     continued to hold the landlord up, put a proposal

11     before this Court that, quite frankly, we think

12     was done in bad faith.

13                  Nobody came to the landlord in the

14     last 30 days and asked for any amendment to the

15     lease.  Nobody came to talk to us,

16     notwithstanding --

17                  THE COURT:  Not even the Wolf

18     brothers?

19                  MR. CAMPO:  Nobody came to us.  This

20     Wolf person never came.  The Debtor never came.

21     The Debtors' counsel never came, Your Honor.

22                  So, for Mr. Backenroth to suggest

23     that the Wolf deal didn't go forward because they

24     requested some amendments to the lease, which the

25     landlord was unwilling to give, it is, quite

54

1          H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2     candidly, Your Honor, disingenuous.

3              And, Your Honor, there was no

4     presentation to the landlord, notwithstanding our

5     repeated requests for the landlord to come, for

6     the Debtor and any prospective purchaser to come

7     forward.

8              Your Honor, we have before us a

9     landlord that has owed $2 million, over $2 million

10    of both pre and postpetition rent.

11             There was a, quote, proposal that was

12    put on the table that was approximately -- that

13    was a $2 million deal allegedly, although the

14    Debtor admits that some deposit from the Wolf

15    transaction had been tendered and used.

16             But notwithstanding that, Your Honor,

17    we stood back and we allowed this process to move

18    forward.  And we attempted to allow the Debtor to

19    move forward and successfully assume, assign this

20    lease, cure our arrears as the landlord is

21    entitled to under 365, as the Debtor is required

22    to do.

23             Instead, Your Honor, the Debtor

24    stands before you today and says, no Wolf deal, no

25    other deal.  And Your Honor, just for the record,

 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2    since there was a publicty will I noticed sale, do

 3    we want to ask whether there are any other

 4    prospective purchasers here who are interested in

 5    taking an assumption and assignment of the lease

 6    and possibly purchasing the assets in accordance

 7    with the terms of the deal --

 8              THE COURT:  I think that is

 9    appropriate, Mr. Campo.  Do you want to pause for

10    a second?  Is there anybody in the courtroom who

11    wants to bid on The Tunnel?

12              MR. DREMLUK:  Your Honor, my name is

13    Robert Dremluk.

14              THE COURT:  Would you mind coming up,

15    please, Mr. Dremluk, and just spell your name so

16    the reporter can get it?  Anyplace you can find a

17    microphone.

18              MR. DREMLUK:  Your Honor, I am

19    appearing here today on short notice on behalf of

20    a group of investors and operators who have -- who

21    continue to operate nightclubs.

22              We were made aware of the situation

23    late last week.  And a number of principles

24    involved are here today.  One flew from California

25    to be here.

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2         We are interested in taking a serious

3    look at this situation.  But we feel that we are

4    going to require some time to conduct some due

5    diligence.

6         We have experience in operating

7    nightclubs, but we need to understand the

8    particulars about this particular situation.  We

9    need to understand issues affecting other

10   interested parties, such as the landlord, such as

11   the SLA, Taxing Authorities.

12        We need to have some dialogue with

13   those people to see what their issues are, and to

14   be able to come into a situation, on a basis where

15   we are on a good working relationship basis as

16   opposed to coming in -- into a situation where we

17   may not be wanted.  And that is not what we want

18   to do here.

19        So we need some additional time to

20   consider what we want to do.  We are not prepared

21   today to make a proposal.  But we are prepared to

22   take a look.  And I think we are a serious

23   candidate for, either an asset purchase agreement

24   or a responsible person agreement.  Either one of

25   those would be options that we would consider.

H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

1

2          A lot of it depends on the position

3   that the parties take, Your Honor, in terms of the

4   landlord's position, concerning its lease, the SLA

5   concerning licensing issues, taxing authorities

6   concerning their issues, and we need to explore

7   those things.

8          THE COURT:  What kind of time are you

9   talking about, Mr. Dremluk?

10          MR. DREMLUK:  Given some vacation

11   schedules, which have been, unfortunately, at the

12   end of August.  We are looking probably at early

13   September as a framework to complete and we have

14   to do and be in a position to either make a

15   proposal or not.

16          THE COURT:  All right.

17          MR. DREMLUK:  If I may, can I

18   introduce -- this is Peter Lupoli.  Mr. Lupoli

19   came from California.

20          MR. LUPOLI:  Good morning, Your

21   Honor.  My name is Peter, L-u-p-o-l-i.

22          THE COURT:  Okay, Mr. Lupoli,

23   welcome.

24          MR. LUPOLI:  I would like to briefly

25   introduce myself.  I represent what we are calling

58

```
 1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2   loosely now the Lupoli Group, which will be

 3   investors / operators thing to take over The

 4   Tunnel.

 5              I first became aware of this on

 6   Wednesday of this week past. I flew here on

 7   Saturday, that evening, to attend this hearing.

 8              It is our sincere desire to deal in

 9   good faith with all the parties. And counsel for

10   the Debtor landlord, there may be some truth in

11   his statements that there have been delays and

12   representations made, but I must tell you that I

13   was never a part of those, and I wish to now make

14   good faith dealings with all the responsible

15   individuals.

16              Because it is protracted and somewhat

17   convoluted, I do need time to have my attorneys

18   and accountants look into this. But we have a

19   genuine and sincere interest. And I just ask you

20   to indulge us the time that is necessary to do a

21   little bit of due diligence. And I am sorry for

22   the delays that may have occurred before that in

23   any representations. But we were never a part of

24   that. And I ask you just to consider us.

25              THE COURT: Okay, what we will do is,
```

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2       there is in a stricter sense no motion now before

3       me with the Debtor having withdrawn it, and if

4       there were one, with you saying although you might

5       be in a position to make a bid, but you are not in

6       such a position today anyhow, that underscores

7       that, I have nothing in the strictest sense before

8       me today.

9               However, I would like Mr. Campo and

10      Mr. Backenroth and anybody else who wants to be

11      heard to state anything they want to just say,

12      now, in anticipation of matters that may come

13      before me down the road. Because, you folks came

14      into the game late, and it is not clear to me

15      whether you would know about some of the concerns

16      that Mr. Campo has raised on behalf of his client,

17      the landlord. Without attempting to characterize

18      them all, he has talked about a substantial amount

19      of both pre and postpetition rent that has to be

20      paid. He has told everybody -- and this was the

21      underpinnings for his, "I told you so remark" --

22      that unless he could persuade his client

23      concerning the contract, his lease expires in two

24      years or thereabouts, and there is a requirement

25      of the insurance -- as to which the Debtor has

60

1          H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2     either actually or arguably not yet been in

3     compliance -- and the landlord has said he expects

4     compliance.  Those are matters that if you do get

5     into due diligence or negotiations, you are no

6     doubt going to want to focus on them.

7                    I am grateful for you folks coming

8     up.  Is there anybody else who wants to be heard

9     with remarks either similar to those or otherwise?

10                    Please come up, sir, and identify

11    yourself when you get to the mike.

12                    MR. BRENNER:  My name is Jeff Brenner

13     I currently promote a party called Kurfew at The

14    Tunnel.  I just want to make mention that I also

15    received late notice about what was going on as

16    far as the details of the auction.  But I have

17    been working with a couple of investment groups

18    and made, in fact, several calls last week to Mr.

19    Campo's client, I think.

20                    And I think because of the difficulty

21    in getting the information from the landlord, we

22    were unable to proceed as far as potentially,

23    seriously considering or evaluating the potential

24    for extending the lease, for example, or for

25    having any other questions that we had being

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    answered.

3         So, I just wanted to bring that to

4    the attention of the Judge, that it was -- there

5    seemed to be a disinterest on the part of

6    Waterfront to return calls that were placed to

7    them on this matter.

8         THE COURT:  Mr. Brenner, I think you

9    preceded your remarks by saying you promote.  What

10   does that mean?

11        MR. BRENNER:  We are the ones who

12   bring the people into the club, do the

13   advertising, print the fliers, do the website

14   promotion.  We do all the general marketing to get

15   people interested in coming down, paying the money

16   to come into the club.

17        THE COURT:  You are acting as such

18   for the existing Debtor?

19        MR. BRENNER:  That is correct.  We

20   are an independent company that is working -- that

21   has been hired by the Debtor.

22        THE COURT:  And you said you have a

23   knowledge of others who might be interested in

24   possibly bidding on the club.

25        MR. BRENNER:  I have been working as

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    an interested party in, obviously, keeping my

3    business going.  My party, Kurfew, has been there

4    for four years.  We are interested, obviously, in

5    keeping that going.

6              I have been trying to locate suitable

7    investors and talking to various investors who

8    might be interested in taking over the space or

9    continuing operations in a manner that is,

10   obviously, in compliance with the landlord's

11   requirements and the community's requirements to

12   everything else.

13             THE COURT:  Anybody else want to come

14   on up and speak?

15             (No response.)

16             THE COURT:  I think, Mr. Campo,

17   though, you were interrupted.  It was a useful

18   interruption, and you can continue.

19             MR. CAMPO:  Thank you, Your Honor.  I

20   am just going to take a moment just to respond to

21   the two parties who did come up.

22             We did have a conversation with Mr.

23   Dremluk outside the courtroom.  We advised Mr.

24   Dremluk, as the landlord has indicated to this

25   Court, and as the landlord has indicated to this

63

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    Debtor on numerous occasions, they are not

3    interested in extending the time of this lease.

4    And, quite frankly, we don't believe they are

5    interested in doing anything with respect to this

6    lease, with its current term of approximately 21

7    months remaining.

8              In fact, we were told that that was

9    probably something that they were not interested

10   in, based on the fact that there was such a

11   limited period of time left on the lease.

12             With respect to Mr. Brenner, Your

13   Honor, my clients advised me that they did not

14   hear from Mr. Brenner last week or the week

15   before.  But, more importantly, Your Honor, Mr.

16   Brenner has been a promoter working for the

17   Debtor.  And if they needed information about this

18   deal, they could have gotten it from the Debtor.

19             The landlord has never turned its

20   back on giving any information to any prospective

21   purchaser.  And, in fact, it was through another

22   broker who is here today that the landlord

23   provided information to Mr. Dremluk's client,

24   including copies of the lease.

25             So, I think it's a little bit

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    disingenuous to stand here and suggest that the

3    landlord has in any way stopped this process from

4    going forward.

5            But, Your Honor, if I may, I would

6    like to return to the points that I was making.

7            Your Honor, as I stated, there is

8    over $2 million in pre and postpetition arrears

9    owing and that number is accruing as we stand

10   here.

11           As Your Honor recalls, at the time

12   Your Honor set this hearing on July 10th, in lieu

13   of getting postpetition rent, Your Honor required

14   that the Debtor pay us postpetition interest on

15   our accruing postpetition rental obligation.  That

16   obligation is now over $177,000 and climbing.

17           The underlying principal --

18           MR. CAMPO:  The underlying principal,

19   Your Honor, is $160,000.  There is late charges,

20   and there is the accruing interest.

21           THE COURT:  That is sufficient for my

22   purposes, Mr. Campo.  I just need to know the

23   order of magnitude.  I don't need to know it down

24   to the last $5,000.

25           MR. CAMPO:  Thank you, Your Honor.

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2          Your Honor, as I stated before, this

3    landlord has been in a constant battle with the

4    Debtor to try to get rent in the prepetition

5    stages --

6          THE COURT:  Just a minute, Mr. Campo.

7    We waived our rules on cell phones.  Every person

8    who has a cell phone on now is to turn it off and

9    we are not going to move until that is done.

10   Whose cell phone was that?

11         MR. LAMB:  It was my phone.  I am

12   leaving.  I am sorry.

13         THE COURT:  Will you please leave the

14   courtroom until you are assured that it's off?

15         MR. LAMB:  It is off, it is off.

16         THE COURT:  Forgive me, Mr. Campo.

17         MR. CAMPO:  It is quite all right.

18         Your Honor, the postpetition rent is

19   accruing.  The prepetition rent hasn't been paid.

20   And now, at the eleventh hour, the Debtor stands

21   up and says they want to bring on a motion for a

22   responsible officer, and, in effect, operate under

23   the lease with a responsible officer and

24   circumvent 365, and, indeed, circumvent the

25   requirements in order to assume and assign a

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    lease, which is exactly what the Debtor, I assume,

3    would probably be attempting to do, although I

4    have not seen anything concrete with respect to

5    it.  We have only heard what Mr. Backenroth has

6    stated, he is, in effect, attempting to do.

7            Notwithstanding the requirements of

8    365(b)(1), notwithstanding the requirements of

9    365(b)(3), and notwithstanding the requirements of

10   365(f)(2), this Debtor would stand before this

11   Court and now say, all right, the gig is up.

12   There is no Wolf.  There is no deal.  But let me

13   bring somebody in here who will put some money

14   into this estate while we do what, while we run

15   out the term of the lease and not cure the arrears

16   to the landlord.

17            Your Honor gave the Debtor a very

18   specific and limited period of time to move

19   forward with the sale of these assets.

20            We have before you, Your Honor, in

21   addition to our objection to the proposed sale of

22   the assets, which, Your Honor, I don't even need

23   to go into the details any longer since Mr. Wolf

24   is not real, and we also have a motion, Your

25   Honor, to compel either the timely performance of

H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

1

2  the lease obligations or the rejection of the

3  lease and the surrender of the premises, pursuant

4  to Sections 105(a) and 365(d)(3).

5          Your Honor, we implore you to allow

6  us to move forward.  We ask this Court to keep

7  this lease rejected.  This Court has been used by

8  this Debtor, possibly not by the lawyers

9  intentionally, but the process here has been one

10 in which the landlord has been injured, the

11 creditors have been injured.

12         We have accruing postpetition rent,

13 no payment on prepetition rent.  And, yet, this

14 Debtor which came before this Court and told the

15 Court that this was a, quote, wasting asset, which

16 they had to promptly sell -- and I can read from

17 the transcript of the July 10th hearing.  There

18 were several occasions, including Mr. Backenroth's

19 own statements to the Court that we are, quote,

20 "Not here to hold up the landlord if there is no

21 sale.  If there is no sale on the return date, we

22 intend to give the landlord back the premises."

23         And we, Your Honor, request that this

24 Court enter an Order deeming this lease rejected

25 because this Debtor cannot perform.  And it is

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    clear that this Debtor cannot assume and assign

3    this lease.  There are no prospective purchasers

4    here who are going to move forward with respect to

5    any deal, Your Honor.  And we would request that

6    Your Honor award -- enter an Order rejecting the

7    lease under 365 and direct the surrender of the

8    premises to this landlord before any further

9    administrative expenses are accrued, and before

10   this landlord is injured any more.

11            This is a postpetition,

12   administrative creditor who is here because we

13   gave the Debtor an opportunity to move forward and

14   sell.  Now, we are here on the return date.  There

15   is no sale, Your Honor.  It is absolutely untoward

16   to consider, consider any extension of this sale,

17   or any extension of the process that has moved

18   forward thus far and to not award this landlord

19   back the premises.

20            THE COURT:  Okay, Mr. Backenroth, I

21   will hear from you, and, in particular, I know or

22   at least expect that you are going to address the

23   points Mr. Campo made, stating in substance that

24   his client was sandbagged with a prospective

25   purchaser who was never there and who failed to

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    communicate with the landlord.  Come on up,

3    please.

4                    MR. BACKENROTH:  Your Honor, we were

5    assured that the Wolf deal was a real deal.

6    Otherwise, we would not have put it before the

7    Court.  They had $100,000 --

8                    THE COURT:  When you say "we," who

9    are you talking about?

10                   MR. BACKENROTH:  I am talking about

11   the client had assured us that the Wolf people

12   were real, and we were in discussions with their

13   counsel.

14                   THE COURT:  Did you also communicate

15   with the counsel?

16                   MR. BACKENROTH:  Mr. Frankel was

17   doing most of the negotiations on those issues.

18   In fact, Mr. Frankel had called the landlord, and

19   certainly in the last couple of days, to find out

20   whether the landlord would consider modifications

21   of the lease.  And they said, "No," that they were

22   prepared to offer substantially more rent than

23   what was involved in the lease.

24                   And the landlord said, "We are not

25   prepared to consider any modifications of the

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2   lease."

3               It is their right not to consider

4   modification of the lease.  But, it is our

5   responsibility to try and maximize the recovery

6   for creditors, and, therefore, assume a backup

7   position.  And the backup position is cure their

8   postpetition obligations as we are required to do,

9   put in the insurance as we are required to do,

10  and, therefore, maximize the return on this asset.

11              Now, on the Kleinsleep, which is the

12  Second Circuit decision, we are not required to

13  immediately assume or reject the lease.  That can

14  wait until some future time --

15              THE COURT:  If you win over Mr.

16  Campo's anticipated objection, on a 365(d)(4)

17  motion.

18              MR. BACKENROTH:  Your Honor, the

19  question is whether or not Your Honor will extend

20  the time to assume or reject the lease on our

21  part.

22              If we pay postpetition obligations,

23  and we will pay all postpetition obligations as

24  part of the proposal, then the question is whether

25  or not Your Honor is going to force us to assume

1     H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2     or reject the lease immediately, in which case,

3     since we are not in a position to pay prepetition

4     defaults, that would be the end of the game.  Or,

5     whether Your Honor would allow us to continue to

6     use this asset, so long as we are paying the

7     administrative obligations associated with the

8     lease.

9                And, the question is are we required

10    to do any more than that.  We tried to do more

11    than that.  We really did.  We tried to find a

12    buyer.  We tried to find someone to do all of this

13    stuff, but, unfortunately, we were not successful

14    in doing it.

15               What we have, well, what we were

16    prepared to put before the Court was a very short

17    notice, I am talking about an Order to Show Cause

18    returnable this week, in which we would get a

19    party in there who would put up the $200,000

20    necessary to cure all postpetition rents, put

21    insurance in place that is necessary to satisfy

22    the landlord's obligation.

23               And, then, the question is, whether

24    or not, in the face of that and in the face of the

25    fact that rent would be paid going forward, and

1     H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2     that would be the condition if they stopped paying

3     rent, of course the lease would terminate, and the

4     estate getting a $40,000 a month overage, over the

5     amount, whether or not Your Honor, in the face of

6     that, would say that, "No, the landlord should be

7     handed back the keys, and that should be the end

8     of it". And that would be Your Honor's call

9     basically, on that issue.

10          As I said, I would have liked to have

11    had a buyer. We are talking about far more

12    substantial money. We don't agree with the amount

13    of money the landlord claims he is owed. We have

14    counterclaims against the landlord.

15          THE COURT: Let me interrupt you, Mr.

16    Backenroth. Let me have a sense as to the lowest

17    common denominator on which you and the landlord

18    would not quarrel. Or putting it another way,

19    assuming for the sake of discussion that you don't

20    agree with everything Mr. Campo's client is asking

21    for, how much, in your view, is owing to the

22    landlord on a prepetition basis?

23          MR. BACKENROTH: Can I have a moment,

24    Your Honor?

25          THE COURT: Sure.

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2                MR. BACKENROTH:  Putting aside the

3    counterclaims for tortious interference,

4    approximately a million dollars.  That is after

5    consultation with Mr. Klinger, who is more

6    involved with the litigations and State Court and

7    the activities that proceeded to Chapter 11.

8                THE COURT:  Okay, go ahead.

9                MR. BACKENROTH:  Basically, the

10   question is whether or not the Debtor cannot sell

11   this asset, at least at this moment, and will be

12   allowed to use the asset so long as he has paid

13   for it, postpetition for all obligations that are

14   due the landlord.

15               They are not necessarily required to

16   get prepetition payments, only if I assume the

17   lease.  But, if I could use this lease and pay

18   them currently and generate assets for the estate,

19   why is it that the Debtor should not be allowed to

20   do that?  That is really the question.

21               We have had discussions with the

22   representative from the Attorney General's Office

23   as to whether or not this kind of approach would

24   work.  We believe that it would work.  Otherwise,

25   we would not be proposing it.  And I am prepared

1          H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2     to bring on this motion on very short order,

3     return date at the end of this week.

4               Your Honor can decide whether he

5     wants to allow the Debtor to do this or the Debtor

6     has to hand back the keys.  And it is not a

7     question of holding up the landlord.  The landlord

8     it is entitled to postpetition rent.  And we are

9     proposing giving him that.  He is entitled to

10    insurance coverage.  We are proposing getting into

11    that.

12              Whether or not if he is entitled

13    under the Second Circuit under Kleinsleep or some

14    other decision for immediate assumption or

15    rejection of the lease is quite another thing.

16              As I said, I would like to have that

17    and have this thing finished, but, unfortunately,

18    that is not what is on the table.  What is on the

19    table is an alternative that will net the estate

20    approximately $800,000, while paying the landlord

21    the postpetition rent obligations that he is

22    entitled to.

23              The landlord had many options, if he

24    wanted to, to negotiate modifications of the

25    lease.  I am not saying I have to do that.  But he

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    had many opportunities to do that.  That wasn't

3    his will to do that.  And I can't force him to do

4    that.  But that doesn't mean that I should simply

5    throw away an asset of the estate, because the

6    landlord says, "This is what I want, this is what

7    I want, this is what I want."

8              Now, the question is, whether or not

9    the Debtor has the right to use this lease

10   postpetition to pay the postpetition obligations,

11   and generate money for creditors.  And maybe, the

12   answer to that is no.  I don't know, I don't think

13   the answer to that is no.  I think the answer to

14   that is yes.  But I am prepared to bring that on

15   short order.  Your Honor can rule on it, whether

16   Your Honor believes that that is appropriate or

17   not, and, really, that is the end of it.

18              THE COURT:  Okay, I think the Second

19   Circuit guidance that governs whether I should be

20   proceeding in the fashion you are talking about,

21   and in particular how I should construe 365(d)(4)

22   extensions or motions to pull the plug, it

23   probably comes more from Burger Boys, and

24   Kleinsleep tells me the consequences to an estate

25   of an assumption when you don't have the

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    wherewithal to pay for it.

3                MR. BACKENROTH:   That is correct.

4                THE COURT:   But with that said, okay,

5    Mr. Backenroth, is there anybody in the courtroom,

6    other than Mr. Campo who represents a creditor of

7    the estate, or is a creditor of the estate in

8    contrast to being either a bidder for assets or a

9    holder of equity.

10               MR. FUCHS:   I work for Mr. Jeffrey

11   Wolf.

12               THE COURT:   Come up please and come

13   closer to the mike.  Tell me your name, please.

14               MR. FUCHS:   My name is Howard Fuchs.

15   I have been representing Mr. Jeffrey Wolf in his

16   negotiations for the purchase of The Tunnel.  Mr.

17   Wolf is certainly a real entity and well capable

18   of buying The Tunnel.  The problem is that he was

19   facing internal problems that he had no control

20   over.

21               He did have a management group in

22   place, Hospitality Consultant Group of New Jersey.

23   However, due to various pressures and

24   conversations they had, they decided not to manage

25   the club.

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2            At the current time, Mr. Wolf was

3    speaking with the current group, Lupoli, who flew

4    in from San Francisco.  And it was his hope to

5    hire them or to work out a deal with them, where

6    they would manage the nightclub.

7            Mr. Wolf is ready to move forward.

8    His attorney was not available today, Joseph

9    Altman.  He is on trial.  He would like to be

10   here.  I can only tell you that Mr. Wolf exists

11   and is ready.

12           THE COURT:  All right.

13           MR. FUCHS:  Not on the purchase

14   agreement.

15           THE COURT:  Not the purchase.

16           MR. FUCHS:  I think he has gone along

17   with this new agreement.

18           THE COURT:  Here's what we are going

19   to do.  What is before me today is, in substance,

20   nothing.  The Debtor, not being in the position to

21   move forward on The Tunnel purchase today, that

22   aspect of its motion has to be regarded as either

23   being withdrawn as moot or withdrawn for some

24   other reason.

25           The Debtor has indicated that he

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    wants to bring on, or counsel for the Debtor has

3    indicated that he wants to bring on a motion for,

4    as he puts it, putting a responsible officer in

5    place, or under some other rubric, a manager who

6    will continue to operate The Tunnel under what

7    sounds like it would be a continued ownership of

8    record by the Debtor.

9         That does not necessarily entail or

10   unless I go below the surface, it doesn't entail

11   at all an assumption of the lease, excuse me, an

12   assignment of the lease, but it may, and certainly

13   Mr. Campo is entitled to be heard on it, involve

14   an assumption of the lease, or a determination by

15   me under 365(d)(4) of the Code that the Debtors'

16   time to assume or reject should be continued.

17   This is bankruptcy 101.

18        Mr. Campo has stated in words or in

19   substance that he opposed both, he opposes an

20   assumption without an assignment.  And he opposes,

21   perhaps even more so, the continued operation

22   without an assumption and without a cure of the

23   prepetition, as well as the postpetition defaults.

24        These are matters, particularly and

25   arguments with respect and to an extent, if any,

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    to which Burger Boys informs my decision to which

3    parties are entitled to appropriate notice,

4    opportunity to be heard, and if they chose to, to

5    submit briefs.

6              Likewise, the U.S. Trustee has

7    indicated, at the least, that she reserves her

8    rights to be heard with respect to whether a

9    responsible officer or agent of the type discussed

10   by the Debtor is appropriate.  These are matters

11   that I am going to give you guys a fair chance to

12   be heard on.

13             Now, I would like to hear from you,

14   Mr. Backenroth, as to how quickly you would have

15   the set of papers where you want to embody

16   whatever you are asking for.  And, then, I want to

17   hear from Mr. Campo and Ms. Davis and anybody else

18   who wants to be heard on it, what they consider to

19   be a fair time to respond.

20             I will waive replies if there is

21   consensus that it's in the interest of reaching a

22   quick decision, to decide it faster, but I am not

23   going to decide anything without giving the

24   landlord and the U.S. Trustee a fair opportunity

25   to be heard.

1     H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2          Mr. Backenroth, the first half of my

3     question.  When would you have papers for whatever

4     you are asking for ready to go?

5          MR. BACKENROTH:  Down tomorrow.

6          THE COURT:  Down tomorrow.

7          Mr. Campo, Ms. Davis, assuming that

8     you got papers tomorrow, how much time would you

9     want to respond, balancing your needs to have a

10    chance to respond with your desire, if I assume it

11    is correct, to be heard quickly on this subject?

12         MS. DAVIS:  Can I have a moment with

13    Mr. Campo?

14         THE COURT:  Certainly.

15         MR. CAMPO:  May I add there is

16    another issue before I respond?

17         THE COURT:  Yes, you may.

18         MR. CAMPO:  It is only because this

19    other matter has some impact on how promptly we

20    would be prepared to go forward.  There are two

21    issues, one is the continuing accrual of

22    postpetition administrative --

23         THE COURT:  I am having trouble

24    hearing you.

25         MR. CAMPO:  I said there are two

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    issues, one is the continuing accrual of

3    postpetition administrative rent.  I hear Your

4    Honor, and I understand that you would be prepared

5    to give us a prompt hearing, and I appreciate

6    that.

7              The second matter, Your Honor, deals

8    with the motion that was brought on by an Order to

9    Show Cause, versus now being converted to an

10   adversary proceeding, which on Friday of last

11   week, counsel, not Mr. Backenroth, but Mr.

12   Frankel, advised my partner, Mr. Safer, that the

13   Debtor was no longer going to oppose, namely, the

14   Order to Show Cause or now the adversary

15   proceeding for the injunction to cease the

16   operations of The Tunnel.

17             I would like to hear Mr. Backenroth

18   confirm what Mr. Frankel told us.  And, if there

19   are not going to be any operations of The Tunnel

20   over this weekend, then what I would propose is

21   give us until Friday to respond and have a hearing

22   on Monday.

23             Your Honor, also, by the way,

24   tomorrow is the trial in that matter.  Your Honor

25   set a schedule for the parties to exchange witness

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    lists, to also exchange documents, and it was in

3    the context of the exchanging of that information

4    that Mr. Frankel told Mr. Safer, we are not

5    opposing your motion any longer. We know we can't

6    continue to operate. And that was the first time

7    he had given us some inkling that they were going

8    to look for a responsible officer.

9             Now, I would like to hear Mr.

10    Frankel, I am sorry, Mr. Backenroth tell us why

11    they are telling us they can't operate. They are

12    telling us they need a responsible officer, but

13    yet they will try to continue operations --

14             MR. BACKENROTH: I think what Mr.

15    Frankel told them, I was not a party of the

16    conversation, but what was reported back to me was

17    that we would not operate without the insurance

18    required under the lease. And that was the basis

19    of their motion. And we have no intention of

20    operating without that. In fact, the Order to

21    Show Cause will require the responsible party to

22    have the appropriate insurance in place as

23    required under the lease in order to operate.

24             So, that, I think, is the request of

25    the injunctive relief. He just stops the

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    conversation at the point where you want to stop

3    operating.  I don't think the commitment was made

4    to stop operating.  It was a commitment made that

5    we won't operate without the appropriate

6    insurance, which we have no intention of doing and

7    which we stand by that commitment.

8            And, in fact, the Order to Show Cause

9    required the new person to do that, to have

10   appropriate insurance.

11           MR. CAMPO:  But, again, I will just

12   ask Mr. Backenroth, what I think I am hearing is

13   that the current management is not going to

14   operate, so, therefore, until there is a hearing

15   on this responsible officer motion, and Your Honor

16   makes a determination as to whether or not the

17   Debtor can move forward with this, there couldn't

18   be any operations because they have admitted they

19   don't have the insurance under the lease.  That is

20   what I want on the record and I want a

21   representation from the Debtor that there is not

22   going to be any operation.

23           MR. BACKENROTH:  I make the

24   representation that if there is no insurance as

25   required under the lease, that is 1 million, 3

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2   million, with no exclusion for assault and

3   battery, there will be no operations.  But I am

4   not making the representation that if we have the

5   appropriate insurance, that we can't operate.

6            THE COURT:  You said 1 million, 3

7   million.  My understanding is, although we did not

8   finally get to a ruling on it, because I believe

9   it became moot, that the better view was it was 3

10  million, wasn't it?

11           MR. BACKENROTH:  No, I am not

12  arguing.  In other words, it's 1 million and 3

13  million in total.  We are not arguing with that.

14  I am not arguing that clause of the lease.  I am

15  accepting the landlord's interpretation, let me

16  put it that way, of the lease, which I understand

17  is 1 million per occurrence and 3 million in

18  total.  And there is no exclusion for assault and

19  battery.

20           THE COURT:  Are you telling -- there

21  are too many plays on words here and double

22  entendres.  I want this to be kind of confirmed in

23  baby talk.

24           Are you representing to me, Mr.

25  Backenroth, that if you -- that before you have

85

 1          H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

 2     operations this coming weekend, you are going to

 3     have all of the insurance that is required under

 4     Mr. Campo's contention as to what is required?

 5               MR. BACKENROTH:  That is correct.

 6     And that is why I believe what was conveyed to Mr.

 7     Campo.

 8               THE COURT:  All right.

 9               MR. BACKENROTH:  If we don't have it,

10     we won't have operations.

11               MR. CAMPO:  The problem with that is

12     that there is not going to be a mechanism for us

13     to review.  And if there is a dispute as to

14     whether that insurance is there, and indeed in

15     place, for Your Honor to determine whether or

16     not --

17               THE COURT:  Well, I suppose we can

18     create a mechanism.  I think where you guys know I

19     have been coming from since the beginning of this

20     case is that I am not of a mind to rewrite

21     contracts.  And I am of a mind to go by what the

22     Code requires.

23               Now, with those two things being the

24     ground rules, number one is that Mr. Campo, you

25     get, in essence, what you have been asking for, at

86

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    least for this weekend, which is protection

3    against the risk that there are operations at the

4    club for which your client is hanging out there,

5    because there is not insurance.

6              If it isn't clear from the questions

7    I have asked, I do have the view, subject to an

8    opportunity to be heard, to brief the issue and to

9    orally argue it, that there are severely or

10   seriously litigable issues as to whether the

11   responsible officer concept has sufficient basis

12   in the Code for me to approve it and assuming that

13   it can be, whether litigable issues under

14   365(d)(4) exists with respect to whether I should,

15   in essence, assume the time, excuse me, extend the

16   time to assume or reject when the landlord is

17   being protected only for postpetition rent and not

18   prepetition rent.

19             I am not going to judge those issues

20   today, except acknowledge that they are serious

21   issues.

22             With all of that said, my original

23   question hasn't been answered and I would like you

24   guys to get back to it and respond to that.

25   Balancing what is, obviously, a landlord need to

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    get this buttoned up as quickly as possible with

3    the desire, as I sensed, to write a brief and/or

4    responding papers, that allow you to tell your

5    side of the story, what do you want in terms of a

6    briefing schedule and a hearing, which I will do

7    my darnest to give you on an expedited basis if

8    everybody wants it?

9               (Off the record.)

10              THE COURT:  Wait a second, Ms. Davis,

11   you're back and she is back, but I want to give

12   Mr. Campo a chance to hear what you have to say.

13              Ladies and gentlemen, I want to

14   balance having you have the ability to confer with

15   maintaining an orderly courtroom and keeping

16   things moving forward here.

17              Okay, Ms. Davis.

18              MS. DAVIS:  Yes, Your Honor, assuming

19   the Debtor files its pleadings tomorrow, we would

20   like three-business days.  I think that would be

21   Friday morning, with a hearing on Monday, if that

22   would be the Court's schedule.

23              THE COURT:  Mr. Campo?

24              MR. CAMPO:  Your Honor, that is an

25   acceptable schedule.  Can I ask Mr. Backenroth two

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2       questions?

3               First off, the time --

4               THE COURT:  First, I would like you

5       to speak in the mike, and second --

6               MR. CAMPO:  Thank you.

7               THE COURT:  Because we don't engage

8       in parliamentary debate here, why don't you raise

9       with me the questions you would like to have

10      answered, and if I regard it as appropriate, I

11      will put them to Mr. Backenroth?

12              MR. CAMPO:  Thank you, Your Honor.

13      Number one, I would like to know the timing for

14      tomorrow, what time we would see these papers.

15              Number two, we heard about this on

16      Friday.  We were told the reason that they were

17      delaying moving forward was because there was no

18      real commitment, and that there wasn't any

19      $200,000 on the deposit.  I would like to know

20      whether or not this responsible officer has

21      deposited the $200,000 with Mr. Backenroth's firm.

22              And then the third thing I would like

23      to ask, Your Honor, is I would like Mr. Backenroth

24      to identify who those responsible officers are

25      now, and I would like a concession from them that

1          H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    we could have discovery of the responsible officer

3    now, not have to wait until they file their formal

4    Order to Show Cause and we file our response.

5                    THE COURT:  All right.

6                    All of those questions are

7    appropriate.  Do you remember them all, Mr.

8    Backenroth?

9                    MR. BACKENROTH:  Well, I would ask

10   for a hearing on Tuesday, only so that we would

11   have twenty-four hours to respond to papers that I

12   assume that they would file --

13                   THE COURT:  I think the question Mr.

14   Campo was asking was not when I would set the

15   hearing, after all the papers were in, but when

16   would you have your papers to him tomorrow?

17                   MR. BACKENROTH:  By the end of the

18   business today.

19                   THE COURT:  All right, we will just

20   define that as 5:00 tomorrow.

21                   MR. BACKENROTH:  Yes.

22                   With regard to some of the other

23   items, the responsible party would be Mr. Aviel

24   Marrache.  He would deposit with my firm, before I

25   file any papers, $200,000.  That is the amount of

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    money necessary to cure the defaults under the --

3    to the landlord for postpetition rent.

4              If that money is not deposited, I

5    will not file the papers.  I would simply inform

6    the Court that the money is not there, and that

7    Your Honor can reject the lease at that point,

8    because I am not interested in horsing anybody

9    around.  But I am interested to the extent that

10   there are monies to be gotten, that we can get it

11   for creditors, Your Honor.

12              THE COURT:  Okay, Ms. Davis?

13              MS. DAVIS:  A spelling of Mr.

14   Marrache's name.

15              MR. BACKENROTH:  M-a-r-a-c-h-e.

16              THE COURT:  Mr. Campo also had a

17   request that it be made available for discovery.

18   It seems to me that that is, I will give you a

19   chance to be heard.

20              MR. BACKENROTH:  When does he want to

21   do it?

22              THE COURT:  Okay, let me just do it

23   this way, I am authorizing and directing expedited

24   discovery if Mr. Campo chooses to avail himself of

25   it, at a time mutually agreed to within reason as

1          H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2     between the two of you, plus Ms. Davis, if she

3     wants to listen in or otherwise participate, and

4     that is a right, but not an obligation on her

5     part.

6                    And although I said, listen in or

7     otherwise participate, needless to say what I mean

8     is as a full participant with all rights in that

9     regard.

10                   If you can't schedule it without my

11    help, call my chambers up and I will do what I

12    need to do.

13                   MS. DAVIS:  Your Honor?

14                   THE COURT:  Yes, Ms. Davis.

15                   MS. DAVIS:  I am sorry to interrupt.

16    You requested some preliminary disclosures in the

17    application.  For instance, generally where a

18    party will be, quote unquote, retained although

19    this is not a formal retention under 327, we would

20    like there to be some representation as to whether

21    or not he is disinterested, has some adverse

22    interest.  We think that should be a part of the

23    application, and that information should not be

24    required to be obtained for discovery --

25                   MR. BACKENROTH:  I will put that in

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    the application.

3                THE COURT:  Absolutely, that is a

4    very reasonable request on her part.

5                Okay, we will have a hearing, but on

6    Tuesday, not on Monday, and the reason for that is

7    not because you asked for it candidly, Mr.

8    Backenroth, but because I have a full day of

9    hearings on PSI Net, a $3.7 billion case and those

10   needs need to be taken care of, too.

11               Papers to be submitted by Mr.

12   Backenroth's side by 5:00 tomorrow.  Service by

13   fax is authorized, as long as it's followed up by

14   hand within a short time thereafter.

15               If they are so voluminous, that

16   faxing isn't practical, just serve them by hand.

17   But I will expect that Mr. Campo will have the

18   papers in hand by some means by 5:00 tomorrow.

19   And responsive papers by 5:00 on Friday, for

20   either or both the U.S. Trustee and Mr. Campo,

21   assuming either of you wants to be heard.

22               You may but need not respond with

23   reply papers on Monday, Mr. Backenroth, but

24   remember that if they are going to do any good,

25   you have to give them to me early enough so that I

93

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    can read them.

3                MR. BACKENROTH:  I understand.

4                THE COURT:  And, this is all without

5    prejudice to any rights either of you have for

6    cross motions, such as 365(d)(4), extensions or

7    related motions, I should say, or motions with

8    respect to that.

9                When does your 120 days run, Mr.

10   Backenroth?

11               MR. BACKENROTH:  I was about to raise

12   that, the 60 days.

13               THE COURT:  Excuse me, Your Honor.

14               MR. BACKENROTH:  Yes, that goes for

15   either Thursday or Friday, so I would ask that

16   Your Honor extend the period to assume or reject

17   to the Tuesday return date.

18               THE COURT:  You will have a Bridge

19   Order until that Tuesday, but it should be

20   understood that the Bridge Order will change

21   neither the burden of proof or persuasion with

22   respect to the extension of the 365(d)(4) periods,

23   all of which shall remain with the Debtor.

24               MR. BACKENROTH:  I understand, Your

25   Honor.

1   H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2          THE COURT:  And, why don't we just

3   assume, your papers should deal with the 365(d)(4)

4   issues when you serve them tomorrow, Mr.

5   Backenroth?  And we are going to put that on for a

6   hearing on Tuesday as well.

7          MR. BACKENROTH:  Okay.

8          THE COURT:  Am I correct, that with

9   the representation you have made, Mr. Backenroth,

10  that you are not going to operate the club without

11  insurance this weekend, and when I say without

12  insurance," I mean the insurance the way Mr. Campo

13  says it should be, that we have nothing left for

14  tomorrow and that it's all going to be a week from

15  tomorrow?

16         MR. BACKENROTH:  That is correct,

17  Your Honor.

18         THE COURT:  Mr. Campo, are you cool

19  with that as well?

20         MR. CAMPO:  Your Honor, I am fine,

21  except how do we know?  I mean, I am not certain,

22  but I thought Mr. Backenroth said that it's the

23  responsible officer who would be getting the

24  insurance for the responsible person.

25         So do I understand the Debtor is not

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    going to get that insurance before they operate

3    this weekend --

4                MR. BACKENROTH:  No, no, when the

5    responsible party, hopefully, gets put in, then he

6    has to have the appropriate insurance as we

7    discussed.

8                MR. CAMPO:  Well then, Your Honor is

9    not -- I am sorry, I didn't mean to cut him off.

10                THE COURT:  Wait, please don't cut

11    him off.

12                MR. BACKENROTH:  The Debtor, since

13    the hearing will be on Tuesday, there will be no

14    responsible party on Friday or Thursday or any

15    other date before the one date that they open up

16    this club.  So the Debtor is still there and has

17    to have the appropriate insurance if it's to be

18    opened, and I think it is Saturday that they have

19    the premises open.  And if we don't, we will have

20    the premises closed.

21                THE COURT:  All right.

22                MR. CAMPO:  So we just need -- Your

23    Honor, if I may, we need some mechanism to review

24    whatever insurance the Debtor is going to provide

25    to us.  I would like to know when they will give

1          H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2     it to us. So if we need to come down to Your

3     Honor on that issue, we will know it.

4               MR. BACKENROTH: We will get it to

5     you by Thursday, is that all right?

6               MR. CAMPO: That just does not leave

7     the Court enough time to hear --

8               THE COURT: I will deal with it on

9     Friday. I am used to doing this kind of stuff,

10    all right. But there will either be insurance of

11    the type that Mr. Campo said, or the club will be

12    dark on Saturday night.

13              MR. BACKENROTH: That is correct.

14    That is the understanding.

15              THE COURT: That is my ruling. I

16    assume there is no misunderstanding on that issue.

17              MR. BACKENROTH: Mr. Gatin is in the

18    courtroom, and he hears Your Honor as well.

19              MR. CAMPO: Your Honor?

20              THE COURT: Yes, Mr. Campo.

21              MR. CAMPO: Two things. First with

22    respect to Mr. Backenroth's statement earlier that

23    if there is no deposit, no $200,000 deposit by

24    tomorrow, they won't submit the papers. I assume

25    that Mr. Backenroth's papers will reflect that

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    they have received the $200,000. If they don't,

3    then he is not going to file them. And we need a

4    mechanism to have a lease rejected.

5              THE COURT: I could not hear you.

6              MR. CAMPO: We would then need a

7    mechanism to have the release rejected because Mr.

8    Backenroth says if they don't get the deposit,

9    they are not proceeding with the Order to Show

10   Cause and, therefore, he is conceding that he

11   didn't have the lease back and at least if he

12   didn't, they would be rejected --

13             MR. BACKENROTH: I am stating on the

14   record that if I do not get the $200,000, tomorrow

15   I will not submit the papers and I will consent to

16   the reject of the lease and that is the end of it.

17             THE COURT: Okay, I will take a lease

18   rejection Order, if it has Mr. Backenroth's and

19   Ms. Davis' no objection on it without further

20   notice. I don't think there is any other party

21   that has appeared in this case that would have a

22   problem with that.

23             Mr. Mann, if you want to be a

24   signatory on that, as well, you are the only other

25   person who has really appeared in this matter?

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2              MR. MANN:  I would.

3              THE COURT:  Then, get a no object

4      from Mr. Mann as well before you submit it.

5              MR. CAMPO:  That is fine, Your Honor.

6              With respect to -- can I just ask if

7      you could ask Mr. Backenroth, he identified it as

8      Mr. Marrache, M-a-r-a-c-h-e, or --

9              A VOICE:  Two R's.

10             MR. BACKENROTH:  M-a-r-r-a-c-h-e.

11             MR. CAMPO:  The papers would explain

12     Mr. Marrache's background.

13             THE COURT:  I think that was a

14     request Ms. Davis made.  I think I already ruled

15     that request was granted.

16             THE COURT:  Okay, we are starting to

17     get repetitive here.  Is there anything else?

18             MR. BACKENROTH:  Could I dispense

19     with an Order to Show Cause and perhaps make it as

20     a notice of motion so I could save the --

21             THE COURT:  Yes, notice it up for a

22     return hearing on Tuesday.

23             MR. CAMPO:  What time?

24             MR. BACKENROTH:  What time?

25             MS. BLUM:  9:45.

H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

1

2          MR. CAMPO:  I know you suggested

3   before that Mr. Backenroth, if he was going to

4   reply, he had to do it early.  Could we have a

5   time for Monday, so we can see his papers?

6          THE COURT:  Mr. Backenroth, do you

7   want to be heard on that?

8          MR. BACKENROTH:  Could have to the

9   afternoon?  I know Your Honor is a quick read, and

10  Your Honor probably knows the issues --

11         THE COURT:  5:00 P.M.

12         MR. BACKENROTH:  Okay.

13         THE COURT:  All right, anything else

14  on this?

15              (No response.)

16         THE COURT:  Now, I have been making

17  the Attorney General's Office cool their heels.  I

18  think that deals with all matters with respect to

19  The Tunnel.

20         MR. CAMPO:  Actually, it doesn't.

21         THE COURT:  Yes, sir.

22         MR. CAMPO:  We do have a motion on

23  today to schedule a 2004 examination of Mr. Gatin,

24  which Mr. Frankel advised our office on Friday

25  that he didn't have any objection to.  He just

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2   wanted to have some opportunity to work out a

3   reasonable schedule for the production of the

4   documents at the hearing.

5               THE COURT:  Mr. Backenroth?

6               MR. BACKENROTH:  I think that we went

7   through discovery with the production of

8   documents, but I will work out -- I mean, if they

9   want, we will put all the documents in a room, and

10  let them go through it, if that is what they want

11  to do.

12              THE COURT:  All right, to the extent

13  it has not already been done, I am authorizing

14  both document discovery and deposition discovery

15  of Mr. Gatin under Rule 2004.

16              I hope and expect that you all can

17  agree among yourselves as to the production of

18  documents, and a satisfactory date for the

19  deposition.  And if you have a problem, come back

20  to me, but I am going to remind you all of the

21  duty to confer in good faith before you bring

22  matters of that character to me.

23              MR. CAMPO:  We will, Your Honor.

24              If I may, just to respond very

25  briefly to Mr. Backenroth, the 2004 that we had

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    was not of Mr. Gatin.  It was of Ms. Gatin.  It

3    was very limited.  It was limited to the

4    postpetition operations.  And it was limited

5    solely to the issue of the Debtors' ability to pay

6    postpetition rent.  We are talking about a

7    full-fledged 2004 examination.

8                    THE COURT:  So we are or we are not?

9                    MR. CAMPO:  We are.  We have noticed

10   a full 2004 with a full 2004 document demand, so

11   we are not expecting to have the same documents

12   reproduced.  We want the prepetition documents.

13   We also now want to examine Mr. Gatin, as we are

14   entitled to, on all issues relevant to the

15   financial affairs of the Debtor.  And Your Honor,

16   quite frankly a lot of this stems from what we

17   were told by Ms. Gatin after we had her

18   preliminary 2004.

19                    MR. BACKENROTH:  They asked for,

20   basically, all the documents of the Debtor.  The

21   only way to deal with all of that is to put it all

22   in a room, let them go through whatever they wish

23   to go through.  If they want to pinpoint things,

24   we will try to pull it out for them, but theirs is

25   as broad and wide as the Mississippi River, their

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    request and we will try and comply with it.

3              THE COURT:  All right.

4              MR. BACKENROTH:  Could I ask that

5    Your Honor order on the record the extension of

6    the time to assume or reject, since we are not

7    actually submitting an Order to Show Cause?

8              THE COURT:  Under 365(d)(4)?

9              MR. BACKENROTH:  Yes, sir.

10             THE COURT:  The record is so ordered.

11   However, I will confirm, once again, what I just

12   said, that the extension that I am granting today

13   under 365(d)(4) is a Bridge Order, which shall

14   neither change the burden of proof or persuasion

15   on the underlying determination as to whether the

16   time to assume or reject under 365(d)(4) is

17   extended, all of which shall remain on the Debtor.

18   So we are going to review it on a clean slate

19   Tuesday, a week from tomorrow.

20             MR. BACKENROTH:  That is fine, Your

21   Honor.

22             Your Honor, with regard to the

23   Limelight, I believe that we have a concession

24   from the landlord that we will agree to the

25   assumption, to the extension of time to assume or

1     H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2     reject up to the date of closing.

3              THE COURT:  Is that correct, Mr.

4     Lichtenberg?

5              MR. LICHTENBERG:  That is correct,

6     Your Honor.

7              MR. BACKENROTH:  I don't have to

8     submit an Order on them?

9              THE COURT:  No, you don't.

10             MR. CAMPO:  I just have two other

11    matters.  They are minor, and I apologize.

12             The Debtor hasn't filed its

13    schedules.  I believe there was a representation

14    last week that they would be filed and then there

15    was a 341(a) meeting, which was one conducted by

16    Mr. Zipes, who is not here today.

17             Also the Debtors' first operating

18    statements are due on Wednesday.  Can we get a

19    representation from the Debtor that we will get

20    both the schedules and the operating statements on

21    Wednesday?

22             THE COURT:  Mr. Backenroth?

23             MR. BACKENROTH:  I hope, I told him

24    we would get it this week, so I hope to get it to

25    him this week.  That is what we said at the 341(a)

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2  meeting, and we stand by that.

3              THE COURT:  All right, get them to me

4  this week, not to me, but to the clerk's office

5  and any party who wants to see them, and, needless

6  to say, the U.S. Trustee for the operating report.

7  and, if you have not complied with that, that will

8  be one thing that I will be looking for you to

9  explain next Tuesday.

10             MR. BACKENROTH:  I understand that.

11             MS. DAVIS:  Unfortunately, we need a

12  more exact date than next week.  We need a

13  specific time and date, because I think that might

14  go to certain cross motions that might be filed

15  before Friday.  So if we can have a time, we would

16  appreciate that, Your Honor?

17             MR. BACKENROTH:  As a said, I will

18  get it to her before the end of the week, Friday

19  morning.  I don't know what else.  I don't want to

20  commit to a date and then we don't --

21             THE COURT:  All right, if the U.S.

22  Trustee's office does not have it by 10:00 on

23  Friday, it is authorized to file any motions it

24  regards as appropriate.

25             MS. DAVIS:  Thank you, Your Honor.

1     H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2              THE COURT:  Okay, all right, I want

3     to hear the SLA motion.  Anybody who is here for

4     other matters is free to leave.  You don't have to

5     leave, but if you are going to leave, I want you

6     to leave quickly and quietly, please.

7              MR. MANN:  Good afternoon, Your

8     Honor.

9              THE COURT:  Just give me a second to

10    have the courtroom shake itself out.  Thank you.

11             MR. MANN:  Good afternoon, Your

12    Honor, the request of the Attorney General, SLA is

13    fairly simple.  There had been administrative

14    proceedings that had been going on for quite some

15    time starting back in 1996.  And, the SLA was at

16    the point of completing those administrative

17    hearings when the Debtors, both of them, filed for

18    bankruptcy.

19             We have a belief that these

20    administrative hearings should be completed and

21    that if there is a revocation Order, it should

22    issued.

23             We believe that the proceedings were

24    the valid exercise of the mandatory powers of the

25    State and that Section 362(d)(4) specifically

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    allows that exact type of hearing to be completed.

3        Case law has made a distinction about

4    the types of recatory powers that really come

5    within 362(b)(4), and those that on its face look

6    like it comes within (b)(4), but actually it does

7    not, and that is the pecuniary interests test as

8    opposed to health, safety and welfare test.

9        Cases have held that where the State

10   really has a pecuniary interest, and that it's

11   really no more or no better a creditor than anyone

12   else --

13       THE COURT:  Such as if you were

14   trying to yank the license for nonpayment of a

15   licensing fee?

16       MR. MANN:  Exactly.  There are a

17   variety of types, of reasons why a license could

18   be yanked, having to do with delinquent taxes,

19   nonpayment of fees, anything of that nature.

20       This particular hearing,

21   administrative proceeding, had absolutely nothing

22   to do with the pecuniary interests test.  It was

23   purely health, safety and welfare.

24       And the cases have held that where

25   that is the case, where there is no pecuniary

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2      interest involved, then 362(d)(4) should apply,

3      and that the State should be allowed to complete

4      its administrative proceedings. And that is what

5      the State believes is the case today.

6              THE COURT: Let me interrupt you, Mr.

7      Mann, because I am certainly in accord with you on

8      the pecuniary interests, but there is -- once you

9      get into the regulation of the health, safety and

10     welfare, I am wondering if there is another fork

11     in the road, and, in particular, if you read Judge

12     Votolato's lot toes's decision out of Rhode

13     Island, where he looked to see whether the

14     particular regulatory interest that the State was

15     enforcing was one that affected the public health

16     and safety.

17              He concluded that it wasn't a

18     pecuniary interest or at least he didn't rule that

19     way. But he said that when you have a requirement

20     that says you have to be open X hours, that

21     doesn't sufficiently go to the public health and

22     safety, as, for instance, a more serious offense

23     can. And, he, therefore, engrafted what I thought

24     was a third inquiry, which was to determine what

25     the grounds for revocation were, and then looked

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    to see whether the health and safety was involved.

3          If I were to agree that the two

4    standards you talked about are appropriate, but I

5    should also look at a third, whether the

6    particular offense here is, in essence, stepping

7    on a regulatory crack on the one hand or really

8    does involve the public, public health and safety

9    on the Order, what would you respond to me?

10          MR. MANN:   I would say that the

11   charges that were against the two Debtors in this

12   case were of sufficient health, safety and welfare

13   standards to go well beyond the standard of the

14   Judge when he talked about the hours or

15   regulation, the hours.

16          These charges are much more serious

17   than that, Judge, and they go to charges of

18   widespread drug use in the premises over quite a

19   long period of time.  And the administrative law

20   Judge goes into that in great detail which, of

21   course, I have attached to the motion papers.

22   And, I certainly would posit that widespread drug

23   use certainly is a lot more serious and would

24   certainly concern the health and safety of people

25   of the State of New York more than merely time,

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    how long a premises is open.

3              So, I would say that if you add that

4    as a third criteria --

5              THE COURT:  You are saying you easily

6    meet that standard?

7              MR. MANN:  Easily.

8              THE COURT:  Do you want to comment on

9    the Debtors' contention that there should be a

10   requirement for "urgently", in essence, written

11   into the statute?

12             MR. MANN:  Judge, I saw that in one

13   case.  That is the only case I found that says

14   urgent is necessary.  Every other case I have seen

15   just says matters concerning or involving or

16   affecting health and welfare.  There is that one

17   case that Debtors did find that added an item of

18   urgency.

19             THE COURT:  And your point is that

20   urgency, the word "urgent" just doesn't appear in

21   the statute?

22             MR. MANN:  That is correct.  I have

23   not seen it anywhere else.  And I think that the

24   standard is still met.  Even if we want "urgency,"

25   and I think there is an argument that could be

1   H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2   made that it is still urgent enough to cause a

3   possibility of drug use, even though there is an

4   acknowledgment that it's not what it used to be

5   when these charges were first brought, I don't

6   think that anyone would say that any drug use has

7   been totally eradicated in these premises.

8   THE COURT:  I don't think it is

9   appropriate and I don't know if I have a basis for

10  actually finding disputed facts here, but should I

11  regard the state of facts as being that the drug

12  use situation is better now than it was five years

13  ago, but it is still a matter of concern to the

14  Liquor Authority, and if so, do I have a factual

15  basis for that?

16  MR. MANN:  I think I will let the

17  Debtor speak to that, rather than myself on that.

18  I think there are issues regarding that.  But what

19  I would state is that the original charges that

20  were brought, and that was what the charges are

21  for, and even though there may have been some

22  correction subsequent to that time, it doesn't

23  vitiate the original reason the charges were

24  brought.

25  And that the decision of the ALJ if

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2   allowed to continue, is still subject to review.

3   I mean if the bankruptcy petition had not been

4   filed, the Debtor would have had the opportunity,

5   under an Article 78 proceeding in State Court, to

6   appeal that.

7            Certainly, we would not have any

8   objection to that happening, if we were allowed to

9   proceed to the conclusion of our administrative

10  proceeding.  And obviously, the Debtor would have

11  his right under Article 78 to raise any issues he

12  wants in State Court.

13           THE COURT:  You are saying in

14  substance that if the State Liquor Authority has

15  been unduly punishing the Debtor for past

16  activities, the State Courts are capable of

17  dealing with it?

18           MR. MANN:  I believe so.  I believe

19  that as part of the overall reviewing of the SLA

20  decision, that could be raised.

21           THE COURT:  I interrupted you.  Would

22  you like to get any further thoughts out

23  uninterrupted?

24           MR. MANN:  Not at this point, Your

25  Honor.  I think I have raised all the issues that

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    I wanted to.

3         THE COURT:  Okay, Mr. Backenroth?

4         MR. BACKENROTH:  Yes, Your Honor.

5         I think looking at Judge Votolato's

6    decision, the Rhode Island decision, that it's not

7    sufficient simply that it's a health, safety and

8    welfare issue.  It has to be an immediate health,

9    safety and welfare issue, something that is of

10   immediate concern.

11        Just as another example, the IDH case

12   or the cases dealing with the zoning situation --

13        THE COURT:  Well, as you can guess, I

14   had -- from my questions to Mr. Mann, I had some

15   problems with reliance on IDH and I had it for two

16   reasons.  One is that since IDH was decided, which

17   was about twenty years ago, the Supreme Court in,

18   I think it's Ron Pair and the Second Circuit, in a

19   case whose name I had forgotten, but which I cited

20   in my decision in Krishnaya, have all talked about

21   that the starting point for an analysis of the

22   Code is what it says.  And there is no requirement

23   for urgency under 362(b)(4), is there?

24        MR. BACKENROTH:  I agree with that,

25   the word does not appear in the statute.  But the

113

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    question is, what is the understanding of the word

3    "police powers"?  Does it mean any exercise of any

4    regulatory police power, does that mean anything?

5    Would it include zoning type of things?  I,

6    myself, had a case many years ago where the zoning

7    was changed the day before the hearing on a

8    sale --

9            THE COURT:  Yes, but wasn't the exact

10   issue in that IDH case whether or not it was a

11   prior conforming use and whether a tolling under

12   the Code would blow it.  If society determined

13   that a prior conforming use does not bother them

14   that much as an exercise of, when exercising a

15   police power, it is like saying, "Yes, we would

16   like to kind of do it, but it isn't all that

17   important to us."

18           MR. BACKENROTH:  Well, that is the

19   question, whether or not, that is really the

20   analysis of those cases; whether or not when we

21   say "police powers," there is a certain threshold

22   of importance, for lack of a better term, that

23   must be reached in order to --

24           THE COURT:  And, the State is talking

25   about drug dealing here, right?

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2                MR. BACKENROTH:  Your Honor, with

3    regard to that, I am not questioning the fact that

4    drug dealing is a very serious issue.  The two

5    points that I would like to make as we had made in

6    our response papers, is, number one, we are

7    talking about activity that took place before

8    1995, and that since then, a serious effort has

9    been made to police the premises.

10               There were independent monitors that

11   were brought in, a former police chief of the City

12   of New York.  There were a lot of efforts that

13   were done.  And, in fact, in State Court, when

14   they moved, when the City of New York moved based

15   upon a nuisance claim, which is a very similar

16   type of claim as the State Liquor Authority would

17   consider, whether or not that this kind of

18   activity is going on over there, the State Court

19   judge did not terminate the ongoing operations

20   based on the grounds that the Debtor was doing

21   everything it possibly could to maintain the

22   premises drug free --

23               THE COURT:  I hear you, but, where,

24   Mr. Backenroth, if the State could analyze the

25   issues and get to what you would contend is the

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    right result in that nuisance case, doesn't that

3    kind of reinforce Mr. Mann's point that they are

4    capable of making sure that the SLA has acted

5    appropriately on any administrative review in the

6    State Court here as well?

7              MR. BACKENROTH:  Obviously, the

8    question would be that the Debtor has a right to

9    go for an Article 78 proceeding.  The question is

10   whether or not similar to those type of issues

11   that would be presented in a State Court Article

12   78 proceeding, whether or not this Court would

13   consider those kinds of issues as well as to

14   whether or not there really is a serious issue

15   concerning health, safety and welfare; or whether

16   there is simply a determination by the Board for

17   reasons that are not of the immediate health,

18   safety and welfare and whether or not Your Honor

19   is prepared to put that gloss on the statute, to

20   determine whether or not the automatic stay

21   applies.

22             That was the basis of the Rhode

23   Island decision, just to use an extreme situation,

24   where the -- where not being open on certain times

25   was not something that caused a problem for

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2   health, safety and welfare.  And, therefore, that

3   kind of regulation could not be that which is

4   contemplated under the police powers.

5               THE COURT:  But suppose you take

6   those, that fact and you convert not being open at

7   certain times to a more precise articulation of

8   what the offense was there?  Theirs was that the

9   bar was not open enough.

10              MR. BACKENROTH:  That is correct.

11              THE COURT:  Suppose, by way of

12  example, you had just the flip side of that.  The

13  bar was open after hours.  I think the Colonial, I

14  forget the name of that Massachusetts case, but it

15  involved keeping it open after midnight.  I am not

16  enough of a drinker to tell you what the closing

17  hour is in New York, but let us say, 3:00 A.M.

18  Suppose you had a bar that was staying open after

19  3.  I would think that being open too late is more

20  of a societal danger than not being open enough.

21              MR. BACKENROTH:  No question about

22  it.

23              THE COURT:  And I would think to pick

24  up on what Mr. Mann told me, if you have drug

25  dealing on your premises, isn't that even more of

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2  a societal concern?

3           MR. BACKENROTH:  There is no question

4  about that.  But the point that we would make is

5  that the basis of the determination was not based

6  upon current activity, but rather on activity that

7  took place before 1995.

8           In addition, we presented to the

9  State Liquor Authority the fact that we are

10  selling the premises, so, therefore, whatever

11  concerns that they have are not a concern going

12  forward.

13           It is not on the issue from 1995 to

14  the present.  It is the point that from the

15  present going forward, we're selling the premises,

16  we are going out of there, so, therefore, at this

17  point, the only party that would be heard would be

18  the creditors who would get the benefit of a

19  transfer of the liquor license and the sale.

20           So, there is a second issue to this

21  thing, not only the question of whether or not

22  anything was transpiring since 1995, which our

23  position was that there wasn't -- that basically,

24  this place was policed as good or better than any

25  other nightclub around, that they had an enormous

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    amount of security, and that was the finding of

3    the State Court judge on the nuisance issue.  So

4    that would be the first prong of our claim.

5            But the second prong is that when you

6    add onto the fact that we only filed so that we

7    could sell it and get out of this thing and

8    generate money for, in essence, the Taxing

9    Authorities and other people that are owed money,

10   that when you put that together, there isn't an

11   ongoing health, safety and welfare issue

12   sufficient to say that there is a police power

13   issue.

14           The automatic stay doesn't apply, and

15   the asset, basically should be terminated, because

16   once the State Liquor Authority terminates this

17   liquor license, that is the end of the entire

18   Debtor operation, or its ability to sell, which I

19   think is more important in this particular --

20           THE COURT:  Do you agree that going

21   forward, the SLA has pretty much the absolute

22   right to assure that the ownership and control of

23   this club is absolutely clean from a drug

24   perspective?

25           MR. BACKENROTH:  Sure, they do.  That

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    is one of the things that they take into

3    consideration.  But I don't think that that is

4    what they really took into consideration.

5              I think in this particular instance,

6    they basically reviewed facts that took place

7    before 1995 as opposed to facts that took place

8    subsequent to that.  I think they disregarded

9    those subsequent events, and at the end of the

10   day, they went forward based upon the fact -- as

11   if the activities that took place before 1995 are

12   the present activities.  Because I think if you

13   objectively look at these steps that the Debtor

14   has taken to maintain a drug-free situation at the

15   premises, that that Debtor has taken all the steps

16   it would, that one can reasonably expect anybody

17   to do and even beyond that, to insure that there

18   isn't drug activity.

19             So I think that the analysis was more

20   on the pre-period as opposed to the post-period.

21   I am talking about 1995.

22             THE COURT:  Yes, but you said more.

23   And you didn't say solely.  And suppose that, for

24   the sake of argument, that it's a lot better,

25   really a lot better, and still a lot better than

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    it was then, but the fact is, the situation wasn't

3    so great then, and even with the improvements,

4    there are still problems because some may argue

5    you can never do away with drug dealing, or maybe

6    it is because the efforts, while well intentioned,

7    have not been fully successful.  Isn't the SLA

8    allowed to pay attention to that?

9            MR. BACKENROTH:  I think they are,

10   but the thing -- the evidence that was presented

11   to the SLA was that it was at least as good, if

12   not better than any other nightclub situation;

13   that there was enormous security over there to

14   prevent that activity from taking place.  The

15   management, it was very vigorous in making sure

16   that there was no drug dealer or drug activities

17   on the premises.

18            So when you talk about that, this

19   Debtor has done the things that they are supposed

20   to do.  That is why I am saying that I would agree

21   if they tried, and they did not do it.  I would

22   agree that that would be a problem.  I don't think

23   that that is the case.  I think they tried.

24            They have put it into place, monitors

25   to make sure that there isn't that activity and

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    they have been very successful.  It doesn't mean

3    that you cannot have an instance where somebody

4    comes in and pulls something out of his pocket and

5    sniffs it up his nose, but a dealer, they have

6    input over there that monitors -- they have

7    private security, making sure that there are not

8    dealers over there, there is no drug activity, and

9    to the extent that there were arrests at the

10   premises, it was generated by the security people,

11   themselves, when they saw that kind of activity,

12   working together with the police, getting that

13   person removed from the premises.

14            So I don't think it is the case where

15   he did something, but he didn't quite get there.

16   I think it is the case where he did what he was

17   supposed to do, but, nevertheless, the SLA is

18   still focusing on past history.

19            THE COURT:  Yes, but aren't you, in

20   essence, asking me to review?  It may be even a

21   violation of Rooker-Feldman, to ask me to review

22   whether the SLA is right or wrong in making points

23   that should be made to the hearing examiner at the

24   SLA and/or a State judge reviewing an SLA decision

25   under Article 78.

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2                In essence, what you're saying is

3      they really did do a good job and to the extent it

4      was not wholly successful, you can't blame them

5      for that.  But isn't that the kind of decision --

6      the SLA is still looking at whether the public

7      health and safety is involved and it may be that

8      you are simply wrong on the merits, isn't it?

9                MR. BACKENROTH:  Yes, I agree with

10     that, whether they are wrong on the merits and

11     whether or not, given the fact that whatever they

12     perceived to be the ongoing situation is coming to

13     an end, in any event, because of the sale, that

14     under those circumstances, adding that additional

15     layer that the automatic stay would protect --

16               THE COURT:  That is your strongest

17     point, that it's coming to an end, in any event?

18               MR. BACKENROTH:  No question.  It is

19     the last issue, which is the issue.  While they

20     argue the other part of it, the fact is --

21               THE COURT:  You don't need me to tell

22     you that you are -- it is coming to an end, in any

23     event is a lot stronger than trying to justify

24     what happened --

25               MR. BACKENROTH:  No question, and

123

1        H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    it's a lot closer to the Rhode Island decision

3    when you start talking in those terms.  In other

4    words, that there is no ongoing activity, there is

5    no ongoing health, safety and welfare concern,

6    and, therefore, the automatic stay should be

7    opposed.

8             THE COURT:  Okay, like I did with Mr.

9    Mann, I interrupted you a lot.  I will give you a

10   couple of minutes to talk uninterrupted.

11            MR. BACKENROTH:  I think we covered

12   basically the points that are involved.  We

13   briefed it.  We basically raised all of these same

14   issues in our responsive papers.

15            THE COURT:  Okay, Mr. Mann, do you

16   want to reply?

17            MR. MANN:  I agree with Mr.

18   Backenroth that we may be coming to the end.  It's

19   a possibility that depending on what happens next

20   week, this motion could be mooted if Mr. Campo is

21   successful in having his lease returned.  So that

22   is a possibility.  It certainly is something that

23   would impact the Court's decision on these

24   motions.  So I can understand --

25            THE COURT:  To what extent does it

1      H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    also affect the Limelight?

3                    MR. MANN:  Affect the --

4                    THE COURT:  The Limelight, the other

5    club.

6                    MR. MANN:  The Limelight is a little

7    different situation because of the prospective

8    purchaser.  The effect on the Limelight would be

9    if the application for a temporary or permanent

10   liquor license is approved or not.

11                   Obviously, if it's not approved, then

12   my motion should probably be approved immediately.

13   And if it is approved, it, in essence, would moot

14   it out.  And I believe that if the permanent

15   license is obtained, then the Debtor would

16   probably voluntarily surrender the current

17   Debtor's liquor license.  So, in that sense, it

18   would be mooted out --

19                   THE COURT:  Okay, all right, this

20   matter has serious consequences to the Debtor, but

21   by the same token, there is a very strong societal

22   interest here.  And I am going to need to review

23   the record, in particular, to focus on the extent

24   to which the State Liquor Authority is focusing on

25   the more recent past, and going forward.

1    H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2         With all of that said, I am likely to

3    write on the subject, and I will get you my

4    opinion on it as soon as practical.

5         I would ask that if it becomes moot

6    in any regard, you let me know, so that I can deal

7    with only those portions that need to be dealt

8    with, if any.  The matter will be taken under

9    submission.

10        Mr. Rosenbloom?

11        MR. ROSENBLOOM:  Yes, if I can just

12   be heard briefly with respect to the Limelight?

13   This is something that --

14        THE COURT:  Sure, just bring the mike

15   closer to you, Mr. Rosenbloom.

16        MR. ROSENBLOOM:  This is a matter

17   which is of greater significance to my client,

18   since, A, we are prepared to close quickly; and,

19   B, I am told that the process becomes a lot more

20   cumbersome and a lot more difficult --

21        THE COURT:  If the license has been

22   already forfeited?

23        MR. ROSENBLOOM:  Yes, Your Honor.

24        THE COURT:  Given what Mr. Mann said,

25   I have a proposal which I will give each of you a

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2       chance to hear.  If so far as it accepts the

3       Limelight, I will so far as there is an objection,

4       take it under submission to see whether the

5       Limelight gets the licenses that it's seeking

6       before I rule, and if Mr. Mann is of the view that

7       it then becomes moot, vis-a-vis the Limelight,

8       then I can decide it only with respect to The

9       Tunnel.  How do you feel about that?

10              MR. VICTOR:  I believe there is a

11      section of the ABC law, I think it is 120,

12      requiring the State Liquor Authority to act

13      within, I believe it is 60 days from the date of

14      filing, which is last week, the formal

15      application.  But, in the past, they have

16      sometimes taken longer than that.

17              So, if we can talk about a 90-day

18      framework, perhaps that would be, or give the

19      State Liquor Authority the time it needs to duly

20      investigate the application and give any

21      appropriate members of the community that desires

22      to come before it, a chance to be heard.

23              THE COURT:  Let me give Mr. Mann a

24      chance to be heard.

25              MR. MANN:  Your Honor, I would make

1       H.C. ENTERTAINMENT/LANSDOWN ENTERTAINMENT

2    my best efforts as far as the SLA to expedite this

3    decision-making process.  I would strongly oppose

4    this Court ordering that to happen, though.  We

5    would be getting into subject matter jurisdiction,

6    sovereign immunity issues, areas I certainly don't

7    want to go into.

8             THE COURT:  You don't need to.  I am

9    aware of them.

10            MR. VICTOR:  I was not suggesting

11   that for the Court.

12            THE COURT:  You guys do your thing.

13   I will do mine.  And I am going to make this call

14   based on what the Bankruptcy Code and case law

15   tells me to do.  The matter is under submission.

16   We are adjourned.

17

18

19

20

21

22

23

24

25

1

2

3                           C E R T I F I C A T E

4

STATE OF NEW YORK        )

5                            )  ss.:

COUNTY OF NEW YORK       )

6

7                   I, SYLANDIA BROCK, a Shorthand

        Reporter and Notary Public within and for

8       the State of New York, do hereby certify:

9                   I reported the proceedings in the

10      within-entitled matter, and that the within

11      transcript is a true record of such

12      proceedings.

13                  I further certify that I am not

14      related, by blood or marriage, to any of

15      the parties in this matter and that I am

16      in no way interested in the outcome of this

17      matter.

18                  IN WITNESS WHEREOF, I have hereunto

19      set my hand this _15_ day of _August_,

20      2001.

21                          _____

22                          SYLANDIA BROCK

23

24

25